**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Davida Ross STALLER and David Owen Saunders, Defendants-Appellants.**

No. 79–5332.

United States Court of Appeals,
Fifth Circuit.

May 14, 1980.

Howard F. Husum, New York City, for Staller.

Mark C. Menser, Fort Lauderdale, Fla., for Saunders.

Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before MORGAN, ANDERSON and RANDALL, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Appellants David Saunders and Davida Staller were found guilty by a jury of knowingly passing and possessing counterfeit twenty dollar ($20) Federal Reserve Notes in violation of 18 U.S.C. § 472 and 18 U.S.C. § 2. On appeal, both appellants contend that the district court erred in admitting certain evidence seized during a warrantless search of Saunders' automobile and in refusing to grant a mistrial following a reference at trial to Saunders' post-arrest silence. In separate arguments, Staller contends that there was insufficient evidence adduced at trial to support her conviction, that a limiting instruction following

the testimony of two government witnesses was prejudicial and confusing, that the court erred in refusing to grant her motion for severance, and that the government's attempt to introduce certain evidence prejudiced her defense. We find no error requiring reversal and therefore affirm the district court.

## I.

The facts, considered in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), reveal that on August 24, 1978, appellants were customers at the J. C. Penney store located in the Gateway Shopping Center, Jacksonville, Florida.[1] While in the store's toy department, Davida Staller purchased two toy cars for $.97 apiece and paid for her purchase with a $20 bill. When the Penney's sales clerk received Staller's payment he noticed that the bottom edge of the $20 bill was torn in an unusual manner. Following the sale, the clerk notified his supervisor that he thought he had received a bad bill. The clerk described Staller as wearing a white T-shirt with a distinctive sliced watermelon design printed on the front.

At approximately the same time that Staller was in the Penney's toy department, appellant Saunders attempted to make a purchase in the store's record album department. When Saunders tendered a $20 bill in payment for his purchase, the sales clerk discovered that she had insufficient change to make the sale. The clerk then told Saunders that he could either wait at that register until a supervisor could bring change or come back later. Saunders replied that he would return later and walked away. The clerk observed Saunders approach the store's cosmetic counter where a woman wearing a T-shirt with a watermelon design on the front was making a purchase. Following the completion of the sale, the clerk saw the woman and Saunders leave the store together.

Shortly after appellants had departed, the J. C. Penney security officer determined that the store had received three counterfeit $20 bills. He then alerted store personnel that $20 bills having identical serial numbers had been passed in the store and informed the local Secret Service office of the incident. In addition, the security officer telephoned other J. C. Penney stores in the vicinity, including the stores in Daytona Beach, Florida, and gave them a description of the counterfeit bills and of a white female wearing a T-shirt with a unique watermelon design.

The Fifth Avenue Card Shop, another store in the Gateway Shopping Center, is located within 100 feet of the J. C. Penney store. During the noontime hour of August 24 Staller entered the card shop, selected an item, and handed the proprietor a $20 bill. Upon feeling the bill, the proprietor told Staller that someone had given her a bad bill and that he could not accept it. Staller took back the $20 bill and paid for her purchase with other money she had in her purse.

At about this same time, Saunders entered the Murphy Mart store also located in the Gateway Shopping Center. While in the store Saunders attempted to make a small purchase using a $20 bill as payment. Suspicious of the bill because it "looked funny," the cashier called the assistant manager to her register. The assistant manager, upon examining the bill, informed Saunders that the bill was not genuine and that the store could not accept it. He also advised Saunders to take the bill to a nearby bank where it could be checked out. Saunders then paid for his purchase with other money he had on his person and left the store with the questioned $20 bill in his possession.

After being informed that a Penney's store in Jacksonville had received counterfeit bills, the manager of the J. C. Penney store located in the Volusia Mall, Daytona Beach, Florida, posted the serial number of

---

1. The record reveals that Davida Staller had accompanied David Saunders on a vacation to Florida.

the bogus $20 bills at cash registers throughout his store. During the late afternoon of August 24, appellant Staller, still wearing the watermelon-design T-shirt, entered the Penney's Volusia Mall store. At the store's cosmetic counter Staller offered a $20 bill as payment for a $1.25 item she had selected. During the course of this transaction the sales clerk compared the serial number of the $20 bill with the serial number that had recently been posted at her register and found that the numbers were identical. Realizing she should not accept this bill, the sales clerk stated that she did not have sufficient change and asked if Staller had any bills of a smaller denomination. When Staller said that she had no smaller bills, the sales clerk called her supervisor, who left with the bill ostensibly for the purpose of getting change.

While Staller was waiting at the cosmetic counter, Saunders entered the store's automotive center and purchased a $1.79 can of car wax, paying for his purchase with a $20 bill. Noticing that the $20 bill was faded on one side and "looked funny," the sales clerk at first refused to accept the bill. Saunders then produced a $50 bill and a $100 bill and offered to pay for the merchandise with one of them. Having insufficient change for either of these bills, the clerk accepted the $20 bill and gave change to Saunders, who then departed.

Meanwhile, the Penney's personnel director had stationed himself at the store's front door where he could observe Staller's actions. From this vantage point he saw a yellow Cadillac park in a space near the front door of the store. The man who got out of the car and came into the store was the appellant Saunders. When the personnel director asked if he could be of assistance, Saunders replied that he was looking for his wife who, he said was wearing a T-shirt with a watermelon design on the front. The personnel director then deliberately directed Saunders away from the cosmetic counter to look for his wife.

While Saunders was thus occupied, the manager asked Staller to accompany him to the store office. Once in the office Staller informed the manager that she was expecting to meet someone and that she had other money in her purse which he was welcome to inspect. The manager looked through this money and saw several smaller bills but no $20 bills. Within a few minutes, Saunders entered the manager's office escorted by an officer of the Daytona Beach Police Department who had been called to the store. After discussions between police officers and store personnel, one of the officers advised both Staller and Saunders of their *Miranda*[2] rights. At this point Saunders stated spontaneously, "The girl didn't have anything to do with it. It is my fault, and I just picked her up for taking a trip."[3]

The police officers placed appellants under arrest for uttering a forged note in violation of Florida law. During a patdown search of Saunders, the officers found a $20 bill bearing the same serial number as the questioned bills, some other currency and coins, and a set of car keys. Before departing the J. C. Penney store on route to the police station, Saunders delivered the car keys to one of the arresting officers.

The officers, pursuant to police department policy, proceeded to inventory the contents of Saunder's car prior to its being towed away by a private wrecker service. In a map compartment on the passenger side of the front seat an officer discovered a roll of five $20 bills; a search of the trunk revealed a plastic bag contain 88 $20 bills. The serial numbers of these bills were identical to each other and to the serial numbers of the bills passed inside the J. C. Penney stores. The officers also inventoried a number of shopping bags from different stores, each bag containing one or two small items of merchandise.[4]

Staller and Saunders were named defendants in each count of a four-count indict-

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Saunders repeated this statement as he was being escorted from the store to a patrol car.

4. The day after appellants' arrest, federal Secret Service agents obtained a warrant to search Saunders' car. The evidence obtained as a result of this search was excluded at trial because the agents had neglected to disclose in

ment.[5] Count One charged appellants with passing counterfeit $20 bills at the Gateway Shopping Center in Jacksonville. Counts Two and Three charged appellants with passing counterfeit bills at the Volusia Mall in Daytona Beach. Count Four charged appellants with knowingly possessing five counterfeit bills. At the conclusion of appellants' joint trial the jury found Saunders guilty on all four counts charged in the indictment. The jury acquitted Staller on Count One but found her guilty on the remaining three counts.[6]

## II.

### A. Inventory Search.[7]

Both appellants argue that the evidence uncovered during a warrantless search of Saunder's car was seized in violation of the Fourth Amendment and therefore should not have been admitted at trial. Although appellants recognize that routine inventory searches of vehicles lawfully within police custody have often been upheld, they maintain that a warrantless inventory search is unconstitutional where the automobile is legally parked in a commercial parking lot during trade hours and there is ample time to procure a warrant before engaging in the search.

Generally, a search of private property is unconstitutional unless it is conducted pursuant to a properly issued search warrant. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). In a limited number of situations, however, warrantless searches have been upheld as "reasonable" under the Fourth Amendment. One recognized exception to the warrant requirement arises when the

police, in the exercise of their "community caretaking functions," *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), acquire temporary custody of a privately-owned automobile. In these circumstances the Supreme Court has held that a warrantless inventory search of the automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion which does not offend Fourth Amendment principles. *South Dakota v. Opperman*, 428 U.S. 364, 372 & 373, 96 S.Ct. 3092, 3098 & 3099, 49 L.Ed.2d 1000 (1976).

The *Opperman* court identified three distinct interests which justify the inventory search of an automobile: protection of the owner's property which may be stored in the vehicle; protection of the police from false claims of lost possessions; and protection of the police from potential danger. Obviously, before the need to protect these interests can arise, the police must have the right to take custody of the vehicle. Appellants argue that the police are neither required nor entitled to take custody of a vehicle legally parked in a mall parking lot. We are unable to accept this argument.

It is true that in *Opperman* the police assumed custody of an automobile that was illegally parked in a restrictive zone. The fact that a vehicle is legally parked, however, does not necessarily negate the need to take the vehicle into protective custody. *See, e. g., United States v. Gravitt*, 484 F.2d 375, 380, n. 5 (5th Cir. 1973), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974). In this case the

---

the warrant sufficient facts to show probable cause.

**5.** Upon appellants' arrest on the federal charges, the local charges were dropped.

**6.** Saunders received one-year suspended sentences on Counts One, Two, and Four and a three-year sentence on Count Three. Staller received concurrent two-year sentences, with six months to serve and the balance suspended.

**7.** In assessing the legality of this inventory search, we look to federal rather than to state law. "The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers." *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1974); *Elkins v. United States*, 364 U.S. 206, 223-24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

automobile's owner,[8] who was from out of state, had just been arrested for passing counterfeit money and taken to jail. The owner had no friend or relative available to take care of the car, as his only travelling companion had also been arrested. The officers who made the arrest had every reason to expect that appellants would be separated from their vehicle for an extended period of time. Although Saunders' vehicle was lawfully parked and presented no apparent hazard to public safety, the officers were aware that a car parked overnight in a mall parking lot runs an appreciable risk of vandalism or theft.[9] The likelihood of such harm would increase with every passing day. Under these circumstances taking custody of Saunder's car was a legitimate exercise of the arresting officer's community caretaking function. Once the officers took custody of the car, they were required by police department regulations to inventory its contents.

This court's opinion in *United States v. Ducker*, 491 F.2d 1190 (5th Cir. 1974), presents a similar fact situation. Conover, an out-of-state traveller, was arrested in a Jacksonville, Florida shopping center for passing a counterfeit $20 bill. Pursuant to sheriff's office regulations, the arresting officers conducted an inventory search of Conover's car in the shopping center parking lot; the following day Customs officials conducted a second inventory search. At trial Ducker contended that the evidence discovered during these warrantless searches should have been excluded at trial. This court rejected that argument, and credited the arresting officer's testimony that he did not feel that the car should have been left unattended in the shopping center parking lot. We believe that the search of Saunder's car in this case was also a valid protective inventory of an automobile lawfully within police custody.

▆▆▆▆ Finally, we find no support for appellants' argument that the inventory procedure used in this case was merely a

pretext for an investigatory search for evidence. The arresting officers took custody of a vehicle which would otherwise have been left unattended, possibly for an extended period of time, in a mall parking lot. They had both the right and the duty to protect that automobile and its contents. We recognize that the officers who had just arrested appellants for passing counterfeit bills may have suspected that other incriminating evidence was present in the car. However, "if an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found." *United States v. Prescott*, 599 F.2d 103, 106 (5th Cir. 1979); *see United States v. Hall*, 565 F.2d 917 (5th Cir. 1977).

### B. *Miranda* violation.

Appellants next contend that the prosecution improperly elicited evidence that Saunders exercised his Fifth Amendment right of silence during a custodial interrogation at police headquarters. The government does not deny that an improper reference was made, but argues that the transgression was harmless when considered in light of the evidence in this case.

On the day following his arrest, Saunders was visited by a federal Secret Service agent. The agent advised Saunders of his *Miranda* rights, and, when Saunders indicated that he did not wish to speak without the presence of counsel, the agent prepared to leave. At this point, Saunders began to talk. He stated that he knew the money was counterfeit, that he had received the money from the sale of two cars, that a friend who saw the money said it was counterfeit, and that he had decided to use the money after Staller had agreed to go on a vacation to Florida with him. Saunders then stopped talking and asked to speak with an attorney. Midway in the trial the government attorney questioned the agent about the nature of Saunder's statement.

---

8. Actually, Saunders had rented the automobile prior to his trip to Florida.

9. The record is silent as to the policy of the Volusia Mall regarding vehicles abandoned on the parking lot premises.

During the course of this exchange the government witness revealed that Saunders had claimed his right of silence and had requested an attorney.[10]

In its landmark decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court observed that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Id.* at 468 n. 37, 86 S.Ct. at 1625 n. 37. *United States v. Edwards*, 576 F.2d 1152 (5th Cir. 1978); *United States v. Fairchild*, 505 F.2d 1378 (5th Cir. 1975). Thus, although the government in this case was entitled to introduce evidence of Saunders' statement to the Secret Service agent, *United States v. Martinez*, 577 F.2d 960, 963 (5th Cir. 1978), it was under a duty to scrupulously avoid any mention of appellant's silence. It is unimportant that the government attorney may not have intended the witness to make such a comment, for even an inadvertent reference to a defendant's assertion of his Fifth Amendment privilege poses the risk that the jury will infer guilt from silence. Finding that the agent's comments were constitutionally forbidden, we must now determine whether the error was harmless beyond a reasonable doubt.

10. The government attorney and the Secret Service agent engaged in the following dialogue:

Q When you saw Mr. Saunders on that particular occasion did you speak to him?
A Yes, sir.
Q Did you advise him of his Constitutional rights?
A Yes, sir.
Q Would you explain to us how you did that, sir?
A We have a printed form and I used the printed form and I read to him his Constitutional rights off a printed form and also had him read it while I was reading it to him.
Q And after you had so-stated his Constitutional rights to Mr. Saunders did Mr. Saunders speak to you?
A Yes, sir.
Q What did he say to you?
A We have two portions to our form, one is the advice of Constitutional rights and the second portion is the waiver portion.
Q Did Mr. Saunders have conversation with you after you advised him of his Constitutional rights?
A Yes, sir.
Q What did he say?
A He said he did not want to talk to me that he wanted to have an attorney present.
MR. CARLTON: Objection, Your Honor. If I could make a motion—
THE COURT: I will hear you at the next recess.
BY MR. WHERRY:
Q Did you leave Mr. Saunders after that?
A After he told me—
Q Just yes or no—did you leave Mr. Saunders at that time?
A No.
Q Did Mr. Saunders speak to you—say something to you?
A Yes, he did.
Q When you were getting ready to leave?
A Yes, sir.
Q What did Mr. Saunders say to you?
A He stated he knew it was counterfeit money.
Q Did he say anything else to you?
A Yes, sir, he did.
Q What did he say to you?
A He stated at this time which was in August of 1978, he stated that eighteen months ago that he had sold two cars and that he had received the money in question as partial payment for the two cars.
Q What else, if anything, did he say to you at that time?
A He stated that a friend of his once before—approximately two months after receiving the counterfeit money—had seen this money and told him it was counterfeit.
Q Did he say anything else to you in regard to what he had done with this money?
A Yes, sir.
Q What did he say?
A He stated that approximately two months before the night that I was interviewing him he had met the Defendant Davida Staller and he had asked her if she would like to go on vacation with him to Florida. She stated yes and it was at that time he decided to use the money.
Q During the conversation that he was having with you or speaking to you did you do anything to make him talk to you?
A No, it was a one-sided conversation.
Q After what he said to you as you now told us, what did you do or where did you go?
A I started—when he finished I started to ask him a question. He stated then that he would like to have—thought he might better contact an attorney at which time I left.
MR. CARLTON: Objection, Your Honor. I would like to reserve a motion.
THE COURT: Very well.

██ In order to declare this error harmless, we must find overwhelming evidence of Saunders' guilt. Since Saunders does not deny that he possessed and passed counterfeit bills, our focus is on Saunders' knowledge—i. e., did he have the requisite "intent to defraud." We believe the evidence overwhelmingly establishes that Saunders was aware that these bills were counterfeit.

The most compelling evidence of Saunders' guilt comes from his own admissions. While in the presence of the Secret Service agent, Saunders spontaneously declared that he knew that the bills were counterfeit. In addition, Saunders stated that shortly after he received the money a friend happened to see some of the bills and told him that they were counterfeit. Following his arrest in Daytona Beach, Saunders told one of the officers that "The girl had nothing to do with it. It is my fault, and I just picked her up for taking a trip."

The other testimony at trial provides further evidence of appellant's guilt. When Saunders attempted to pass a $20 bill at the Murphy Mart store in Jacksonville, Florida, both the cashier and the assistant manager informed Saunders that they thought the bill was counterfeit. The assistant manager refused to accept the bill and advised Saunders to take it to a nearby bank. Within a few hours of this occurrence, Saunders passed a counterfeit $20 bill at the J. C. Penney store in Daytona Beach, Florida. Considering the combined strength of all this evidence, we believe that, had the improper comment never been made, "[a] verdict of not guilty would have been a stunning surprise." *United States v. Wilkerson*, 534 F.2d 43, 44 (5th Cir. 1976). We hold that the error was harmless beyond a reasonable doubt.

### III.

A. Sufficiency of the Evidence.

██ In a separate argument, appellant Staller contends that there was insufficient evidence to support her conviction on Counts Two, Three and Four of the indictment. Because Staller does not challenge the government's proof that she possessed and passed counterfeit $20 bills, the only question on appeal is whether Staller harbored an intent to defraud. In order to establish the statutory requirement of intent, the government's evidence must show that Staller had knowledge that the bills were counterfeit. *United States v. Stone*, 601 F.2d 800 (5th Cir. 1979); *Ruiz v. United States*, 374 F.2d 619, 620 (5th Cir. 1967).

██ The appropriate test for reviewing the sufficiency of the evidence is whether a reasonably minded jury could conclude that the evidence is inconsistent with every reasonable hypothesis of the defendant's innocence. *United States v. Henderson*, 588 F.2d 157, 161 (5th Cir. 1979); *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Only if this court finds that the jury must necessarily have had a reasonable doubt will the verdict be overturned. In making this assessment, we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and we must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. *United States v. Black*, 497 F.2d 1039, 1041 (5th Cir. 1974). The test is the same whether the evidence is direct or circumstantial. *United States v. Warner, supra*, 441 F.2d at 825.

██ Utilizing these principles, we find that the government presented sufficient evidence for the jury to convict Staller for knowingly possessing and passing counterfeit $20 bills. At the J. C. Penney store located in the Gateway Shopping Center, Staller brought two $.97 toys and paid for her purchase with a counterfeit $20. Shortly thereafter, Staller entered the Fifth Avenue Card Shop, located across the mall from the J. C. Penney store, and attempted to pay for a purchase with another $20 bill. Upon receiving the bill the store proprietor informed Staller that she had a "bad bill" and refused to accept it. He also advised Staller to take the bill back where she got it. Staller then paid for her purchase with other money she had in her possession. La-

ter that same afternoon, Staller entered the J. C. Penney store located in the Volusia Mall and attempted to purchase a $1.25 item at the store's cosmetic counter, tendering a $20 bill as payment. The sales clerk recognized that the bill was not genuine and told Staller that she did not have sufficient change. When Staller stated that she did not have any smaller bills, the sales clerk called her supervisor, who asked Staller to wait for change. After a further delay, Staller accompanied store personnel to the manager's office where she produced other, smaller denomination bills from her purse.

■ The "guilty knowledge" necessary to a counterfeiting charge can seldom be proved by direct evidence. However, surrounding circumstances may supply inferences of knowledge which adequately prove intent. *United States v. Sink*, 586 F.2d 1041, 1049 (5th Cir. 1978); *cert. denied* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). In this case, the government produced evidence that Staller passed a counterfeit $20 bill that had previously been turned down as being no good. *See United States v. Casey*, 431 F.2d 953 (5th Cir. 1970). The government also established that Staller attempted to use a large denomination counterfeit bill rather than change she had received in prior purchases. This evidence is highly probative of appellant's guilty knowledge. *United States v. Haggins*, 545 F.2d 1009, 1013 (5th Cir. 1977). Finally, the government demonstrated that Staller lied when she told the J. C. Penney's sales clerk that the counterfeit $20 bill was the smallest bill she had. Considering all the evidence adduced at trial, we conclude that the jury had sufficient evidence before it to find that Staller was aware of the nature of these bills.

B. Cautionary Instruction.

Staller argues that a limiting instruction given by the court following the testimony of two government witnesses was prejudicial to her defense. At trial the district court admitted the testimony of two employees of Murphy Mart who, though unable to identify appellant Saunders in court, stated that they had previously identified Saunders in a pretrial photographic display. Both witnesses testified that they had refused to accept a $20 bill that Saunders had tried to pass and had informed him that the bill was counterfeit. After admitting this testimony, the court instructed the jury that the evidence was to be considered only as to the issue of knowledge by each defendant that the bills were counterfeit. Staller objects that the instruction was prejudicial and confusing because it appeared to indicate that the testimony of these witnesses, who identified only Saunders, could be used against Staller.

■ Because Staller raised no objection at trial, the court's instruction is subject to review under the plain error standard of Rule 52(b), Fed.R.Crim.P. The plain error rule is invoked only where the error complained of affects substantial rights and the appellate court is required to remedy a clear miscarriage of justice. *Mims v. United States*, 375 F.2d 135, 147 (5th Cir. 1967). We find no such error in the court's instruction, and we question whether any error occurred at all.

In its instruction, the court referred to the testimony of Alan Mangen, the assistant manager of the Murphy Mart store, and did not mention the testimony of the Murphy Mart cashier, Violet Bradley. Mr. Mangen testified that he had informed *Saunders* that his $20 bill was "phony." The court also referred to the testimony of William Shay, the proprietor of the Fifth Avenue Card Shop. Mr. Shay had testified that he had refused to accept a $20 bill offered by appellant *Staller* and had informed her that she had been given a "bad bill." The court then stated:

> You may consider the testimony of Mr. Mangen and Mr. Shay on the issue as to whether the Defendant under consideration had knowledge that the counterfeit obligation alleged in the count under consideration was in fact counterfeit.

■ Staller argues that this language impermissibly instructed the jury to consider Mr. Mangen's testimony against either

appellant, and not just against Saunders. While this is a possible interpretation of the court's language, we do not believe that the jury so construed the court's instruction. The jury was well aware that each witness had had contact with only one of the appellants, Mr. Mangen with Saunders and Mr. Shay with Staller. Much of the evidence at trial followed this pattern. Sensitive to the problems that inhere in a joint trial, the court had earlier admonished the jury to be careful in sorting out the evidence in the case:

> Members of the jury, in this case the Government has charged both of the defendants in each count of the Indictment. However, there has been evidence of alleged transactions out of the presence of one Defendant and allegedly in the presence of another. Now, you should not consider evidence of any statements or acts done outside the presence of a Defendant as evidence against that Defendant in your deliberations unless you have found from the evidence that both Defendants were working in concert together.

The court repeated this warning during the final charge to the jury. Although the challenged instruction could have been more clearly stated, we are convinced that the passage did not confuse the jury or prejudice Staller's defense in any way.

C.  Severance.

Staller next contends that she was substantially prejudiced by the district court's denial of her motion for severance. We disagree.

■■■ Under Rule 14, Fed.R.Crim.P., the trial court may grant a severance of defendants in a joint trial if it appears that a defendant is prejudiced by the joinder.

In considering a motion for severance, the trial court must balance the possible prejudice to the defendant against the government's interest in judicial economy. *United States v. Garza*, 563 F.2d 1164, 1166 (5th Cir. 1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). This balancing process is entrusted to the sound discretion of the district court, and, absent an abuse of discretion, the court's decision to deny severance will not be overturned on appeal. *United States v. Zicree*, 605 F.2d 1381 (5th Cir. 1979).

■■■ In order to demonstrate abuse of discretion, a defendant must convince this court that the denial of severance caused him to suffer *compelling* prejudice; a mere showing of some prejudice is insufficient. *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Staller has not shouldered the burden of establishing such prejudice. This trial did not present an extremely difficult set of facts or involve numerous defendants. The trial judge cautioned the jury to consider the evidence against each defendant separately. We believe that it was clearly within the jurors' capacity to follow the court's instructions,[11] and therefore we find no abuse of discretion.

D.  Inadmissible Evidence.

We have carefully considered Staller's final argument that the government's attempt to put into evidence two counterfeit bills that were never connected to either defendant constituted reversible error. We see no merit to Staller's contention.

AFFIRMED.

---

11. In this case Staller claims that the jury determined her guilt by considering evidence admissible only against her co-defendant, Saunders. The test for prejudice is such cases is

> Whether under all the circumstances of [a] particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon

that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*Tillman v. United States*, 406 F.2d 930, 935 (5th Cir.), *vacated in part on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).