**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Lawrence LENTZ and Raymond Clinton Hullum, Jr., Defendants-Appellants.**

**No. 79–5418.**

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1980.

---

Charles O. Grigson, Austin, Tex., for Lentz.

J. P. Darrouzet, Austin, Tex., for Hullum.

Leroy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before AINSWORTH and GEE, Circuit Judges, and HUNTER *, District Judge.

GEE, Circuit Judge:

In this somewhat bizarre case, a former sheriff of Burnet County, Texas, R. C. Hullum, one of his former deputies, Charles Johnston,[1] and a civilian who had cooperated with law enforcement officers in the past, William Lentz, were indicted for illegal wiretapping.[2] The trial court granted motions for acquittal on count four, but Lentz and Hullum were convicted by a jury of the remaining three counts of the indictment. The government elected to proceed to sentencing on the conspiracy conviction and only one substantive offense as to each defendant. Hullum was sentenced to concurrent sentences of one year imprisonment on each of the two counts, with the court ordering that he be released as if on parole after serving nine months. Lentz received

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. Johnston plead guilty and testified for the government at trial. He is not a party to this appeal.

2. Specifically, count one of the indictment charged them with conspiracy to intercept wire communications in violation of 18 U.S.C. §§ 371, 2511(1)(a); count two charged Hullum with the completed, substantive offense of intercepting, endeavoring to intercept, and pro- curing the interception of wire communications in violation of 18 U.S.C. § 2511(1)(a) and charged Lentz and Johnston with aiding and abetting Hullum; count three charged Lentz with the completed offense and Hullum and Johnston with aiding and abetting; count four indicted Lentz for possession of a device for use in the surreptitious interception of communications in violation of 18 U.S.C. § 2512(1)(b) and charged Hullum with aiding and abetting in the last-mentioned violation.

the same concurrent terms of imprisonment and was ordered to be released as if on parole after serving six months. They now appeal to this court, and we affirm.

### Factual Background

Sometime in mid-February 1979, Hullum, who was then the duly elected sheriff of Burnet County, discussed with his chief deputy, Jack Hall, Hullum's interest in curtailing illegal drug traffic in the county and his belief that a house on Mormon Mill Road was occupied by two women[3] who were involved in that traffic. Hall testified that a search warrant had been executed on the house the preceding August, yielding a little marijuana, but that he knew of no intelligence information on any drug operation there in February 1979. According to Hall, Hullum suggested that a phone tap be made on the Maddox residence's line. Both men seemed aware that the proposed tap would be illegal.

At about this same time, Sheriff Hullum also suspected that another residence in the county, this one in the Granite Shoals area and wholly unconnected with the drug traffic problem, was a repository for stolen property. Hall testified that he explained to Hullum that it would take time to get a confidential informant within the stolen goods ring to work undercover for the sheriff's office. At that point, Hullum asked Hall to break into the house to obtain serial numbers from the stolen property so that a search warrant could be executed and suggested that Hall enlist the assistance of William Lentz, a civilian who had previously served in a confidential informant capacity for law enforcement officers.[4] Evidently Hullum repeated his request for a break-in several times over the next few days.

Deputy William Fargo was Burnet County's representative on the Organized Crime Unit[5] and spent much of his time in Austin. Hall discussed with Fargo the sheriff's plans to wiretap the house on Mormon Mill Road and to break into the house at Granite Shoals. Fargo in turn talked to Lieutenant Bobby Simpson of the Austin Police Department, the head of the Organized Crime Unit, and Special Agent Robert Hogland of the Federal Bureau of Investigation. A few days later, Hall met with Simpson, Hogland, and Fargo in Austin, at which time Hall told the men of Hullum's ideas. Simpson provided Fargo and Hall with recording equipment to wear during their conversations with Hullum. Later the FBI provided Fargo with a more compact recording unit than that provided by Simpson.

The next day, March 8, Hullum, Hall, and Fargo met out in the countryside at a roadside rest area. Hall wore a microphone that Simpson had given him; the receiver and a recorder were in the trunk of Fargo's car. Hall asked Hullum if he still wanted to tap the telephone line from the Maddox residence, and Hullum answered in the affirmative, stating that his informant was a person who shared a party line with Maddox and that the tap would be the only effective way to discover the activities of the smuggling operation. Hullum suggested that Lentz be brought in to do the actual tapping and that he also be approached about the break-in at the Granite Shoals residence.

In the evening of the following day, Hullum, Hall, and Fargo, joined by Lentz, met at Bear Creek Cemetery in Burnet County. Hall again wore a microphone to tape the conversation. During this meeting Hullum told Lentz that he was about to discuss with him the most serious thing he had ever been

---

3. Hullum believed that Patricia Maddox and another woman lived in the house during the events in question; testimony at trial, however, showed that although Maddox had lived there, she had moved out before February 1979. Nevertheless, the house was often referred to as the "Maddox residence" in the trial testimony, and we will use that terminology here. *See also* our discussion of the indictment, infra.

4. In the winter of 1978–79, Lentz had worked undercover at the behest of the Organized Crime Unit, a task force composed of law enforcement officers from six contiguous counties and headed by the Austin Police Department, and had helped to break up a counterfeiting ring in early February 1979.

5. *See* n.4, *supra.*

involved in and that they could be in serious trouble if it were not handled correctly. Hullum then asked Lentz to tap the Maddox telephone line. Lentz evidently was enthusiastic about the operation and agreed to the wiretap; he explained that his primary problem would be finding a spot from which he could set up and tap the line and volunteered to get any needed equipment from a friend, at which point Hullum again reminded him that the operation was illegal. Hullum also stressed to Lentz the fact that, if anyone were caught, he would be doing "federal time." Nevertheless, Lentz was undeterred; he even indicated that he would be willing to take the blame alone should the illegal activity be uncovered.

Hullum left this meeting briefly to get some equipment that Lentz might be able to use.[6] While he was gone, Fargo and Hall explained the break-in operation at Granite Shoals to Lentz, who also seemed willing to undertake that task, and discussed various ways to get into the house undetected.

Another meeting was held at Bear Creek Cemetery four nights later. The same participants were present as at the previous meeting there, with the addition of Deputy Johnston. This time Deputy Fargo wore recording equipment provided by the FBI. Lentz told the others that he had obtained the proper equipment with which to tap the line, and he and Hullum discussed the details and location of the tap. Finally, a site near the Maddox house that was hidden from the road during the day was selected. Hullum and Lentz again discussed the illegality of the operation, and Lentz repeated his offer to take all the blame if they were caught. The break-in operation at Granite Shoals was also discussed briefly. Lentz and Johnston left the meeting together to pick up the pole-climbing equipment that Lentz had borrowed from a friend, with the explanation that he needed it to hang a night light from a pole. The five men reassembled at the prospective wiretap site

and, after looking around, decided to meet in the sheriff's office the next morning to make final plans.

At that morning meeting, Deputy Fargo again wore a microphone and recording equipment. The plans as finally made called for Hall and Lentz to drive with Fargo to the wiretap site in a borrowed truck. Hall volunteered to carry some of the wiretap equipment for Lentz, and Fargo served as their lookout. After Lentz climbed the pole, he or Hall was to radio Johnston, so that the latter could make radio contact with Sheriff Hullum, who had driven to a location near the Maddox residence. Sheriff Hullum then was to go to the residence of his informant, who shared a party line with Maddox, and make a phone call to the sheriff's office, keeping the party line open to enable Lentz to find it and tap into it. All went according to plan for a time, but, once atop the pole, Lentz attempted for 15 or 20 minutes to find the right line, to no avail. He notified Deputy Hall of this, and Hall walked to the truck and told Fargo. Fargo drove about a mile to the other side of the Maddox residence, found Hullum, and told him of the problem. After Hullum discussed and then rejected the possibility of using someone else to do the wiretap, Hullum told Fargo to direct Lentz to try again for about a half hour to tap the line and, if unsuccessful, to stop and return to the sheriff's office. When Fargo returned to the tap site, he had some difficulty locating Hall and Lentz; after he found them, he told them to break off work. The men all returned to the sheriff's office, and shortly thereafter, Lentz and Sheriff Hullum were arrested.

### Sufficiency of the Evidence

As one of the elements of the government's case under 18 U.S.C. § 2511(1)(a), it had to prove that the telephone conversations at issue were "wire communications," which are defined in 18 U.S.C. § 2510.[7]

---

**6.** The equipment with which Hullum returned was rejected by Lentz as obsolete; he stated that he could obtain better equipment, perhaps by the next day.

**7.** Title 18 of the United States Code provides, in pertinent part:

§ 2511. Interception and disclosure of wire or oral communications prohibited

Both defendants contend that the government's evidence was insufficient to show that the wire communication in this case was furnished by a common carrier.

▮ Defendants carry a heavy burden here, since the evidence must be considered in the light most favorable to the verdict, and we must draw all reasonable inferences and decide credibility choices in favor of the jury's decision. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Hitsman*, 604 F.2d 443 (5th Cir. 1979). The government introduced testimony by Mary Gail Knight, who lived in the Maddox residence during the attempted wiretap, indicating that her telephone number was 756-4478 and that the telephone line was a four-party line. Mrs. Wall, from whose residence Sheriff Hullum placed the call to the sheriff's office to keep the line open, testified that her phone number was "area code 512-756-4028" and that she was on the same party line with Mrs. Knight. A tape recording clandestinely made by Hall of a meeting at which Hullum and Lentz planned the eavesdropping operation was played before the jury; the recording contains the following conversation:

Hall: Our phone system out here is a little more obsolete than what they have in Austin, too; I don't know if you can do that on a party line. Some of this phone system is some kind of mess . . . . .

Fargo: This is General Telephone, too.

Hall: No, this is Continental; one step below General.

After the government rested its case, Lentz and Hullum moved for judgments of acquittal. At that point the government requested the court to take judicial notice of the interstate nature of the telephone communications, but there is no indication in the record that the trial judge did so. However, the court obviously felt that the foregoing evidence was sufficient to submit the issue of whether the conversation at issue was a "wire communication" to the jury. That is, he obviously believed that a reasonable minded jury would not necessarily entertain a reasonable doubt as to the existence of this essential element. *See United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir. 1977).

While the evidence of the common carrier status of the company providing the telephone at issue was thin, and while we do not congratulate the government for its skimpy proof of this element, we think that the evidence presented passes muster. From the testimony, the jury could have concluded, based on the common fund of information supposedly possessed by jurors, that the assignment of an area code to a number indicates that the telephone in question is capable of being used in interstate telephone calls and that the telephone was not merely part of a private intercom system.

Defendants point out that in *United States v. Jones*, 580 F.2d 219 (6th Cir. 1978), the government proved only that the telephone at issue was furnished by South Central Bell Telephone Company and that the court refused to allow the jury to use its common experience to draw the inference that the telephone was furnished by a common carrier. Rather, the Sixth Circuit ruled that South Central Bell's status as a common carrier, under the facts presented in *Jones*, must be governed by the judicial notice provisions of the Federal Rules of Evidence. *Id.* at 222-23. Since the govern-

---

(1) Except as otherwise specifically provided in this chapter any person who—
   (a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

.    .    .    .    .

shall be fined not more than $10,000 or imprisoned not more than five years, or both.
§ 2510. Definitions
   As used in this chapter—

(1) "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications . . . . .

ment in *Jones* did not move the court to take judicial notice at trial, the Sixth Circuit reversed Jones' conviction. Defendant also relies on *United States v. Blattel*, 340 F.Supp. 1140 (N.D.Iowa 1972), in which the government merely proved that the telephone was provided by Northwestern Bell Telephone Company and unsuccessfully moved the court to take judicial notice of Northwestern Bell's common carrier status 17 days after the jury's verdict.

We think the facts introduced by the government in the instant case distinguish it from *Blattel* and *Jones.* Here the government proved a vital fact: the number of the telephone at issue included an area code. In light of the evidence, it was not necessary for the court to take judicial notice of Continental's common carrier status, and the jury could draw an inference of such status from its common fund of knowledge. Since the evidence was sufficient to go to the jury, we find that defendants have not carried their burden under *Glasser*, and we reject their contentions on this point.

### Entrapment and Due Process

■ Lentz argues that the evidence shows that he was entrapped as a matter of law. However, "[i]t is well settled that the question of entrapment, if fairly raised, is one for the jury." *United States v. Benavides*, 558 F.2d 308, 310 (5th Cir. 1977). The defendant must first present some evidence that the government agents induced him to commit the offense charged. *Id.; see also United States v. Wolffs*, 594 F.2d 77, 80 (5th Cir. 1979); *United States v. Sherman*, 200 F.2d 880, 882–83 (2d Cir. 1952). Then the government must prove beyond a reasonable doubt that "the accused was ready and willing, without persuasion and was . .

awaiting any propitious opportunity to commit the offense." *Wolffs*, 594 F.2d at 80; *see also Benavides, supra; Sherman, supra.* Put another way, the key to an entrapment defense is the accused's predisposition to commit the crime. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 448–49, 53 S.Ct. 210, 215, 77 L.Ed. 413 (1932).

■ The testimony from the government's own witnesses was sufficient to sustain defendants' burden of production in the instant case. That is, it can be inferred from the testimony of Hall and others that Lentz was induced by government agents to participate in the wiretapping scheme; thus, the government of necessity shouldered the burden of persuasion on predisposition. Lentz argues that there is no evidence that he had any predisposition to commit the acts alleged in the indictment and that the government's proof failed as a matter of law. We disagree. There was a great deal of evidence in the record from which the jury could find Lentz' predisposition: his statements that he knew the transaction was illegal, coupled with his willingness to continue his efforts to wiretap the phone; his volunteering to provide Hullum with eavesdropping devices; his exculpatory stories, told to the persons from whom he borrowed the equipment, regarding the use of the equipment; and his readiness to "take the rap" for the law enforcement officers should they be caught.

■ The court's charge on entrapment, to which Lentz makes no objection, correctly spells out the law and the burden of proof for the jury.[8] Thus, since the evi-

---

8. Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government

agents provide what appears to be a favorable opportunity is not entrapment.

If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred regarding the offenses charged in the indictment, the defendants William Lentz and R. C. Hullum were ready and willing to commit the crime as charged in the indictment, whenever the opportunity was afforded, and that law

dence on predisposition was sufficient to go to the jury and since the jury was given correct guidance, we must uphold the jury's verdict of guilty. In other words, the evidence in Lentz' favor is not "so overwhelming that it [is] 'patently clear' or 'obvious' that [the accused] was entrapped as a matter of law." *United States v. Bower*, 575 F.2d 499, 504 (5th Cir. 1979), *quoting from United States v. Groessel*, 440 F.2d 602, 606 (5th Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971).

Lentz makes much of the fact that the entire plan was conceived by law enforcement officers and that his only motive was to help those officers catch criminals. However, entrapment is not necessarily present merely because government agents provide the opportunity or means to break the law. If Lentz was a willing, knowing, and voluntary participant in an illegal scheme, and the jury found that he was, not entrapped.

Lentz, joined by Hullum, also argues that the conduct of law enforcement agents in this case is so outrageous and the degree of involvement by law officers so excessive, that due process principles absolutely bar the govenment from invoking judicial process to obtain a conviction. We note that five members of the Supreme Court, in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), would accept the argument that in some circumstances government involvement in the crime charged could be so high as to bar prosecution. *See id.* at 491, 493, 96 S.Ct. at 1650, 1652 (Powell, J., joined by Blackmun, J., concurring); *id.* at 495, 96 S.Ct. at 1652 (Brennan, J., joined by Stewart, J., and Marshall, J., dissenting).[9]

We agree with Mr. Justice Powell in his analysis of the defense of entrapment in which he states that " 'entrapment' should now be employed as a term of art limited to [the concept of predisposition]. This does not mean, however, that the defense of entrapment necessarily is the only doctrine relevant to cases in which the government has encouraged or otherwise acted in concert with the defendant." *Id.* at 492 n.2, 96 S.Ct. 1651 (Powell, J., concurring) (citation omitted). At least two of our sister circuits have held that excessive governmental involvement in a crime will bar prosecution of a private citizen. *See United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). The Second Circuit has dicta to that effect. *See United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). Our circuit has also indicated, in dicta, that it might accept the defense of outrageous governmental conduct. *See United States v. Till*, 609 F.2d 228, 230 (5th Cir. 1980). Therefore, we will assume, although we emphasize that we do not decide, that the conduct of government agents could be so excessive and outrageous as to bar, on due process grounds, prosecution for a particular crime, even if the

---

enforcement officers or their agents did no more than offer the opportunity, then the jury should find that the Defendants William Lentz and R. C. Hullum are not victims of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt as to whether the Defendants had the previous intent or purpose to commit the offenses charged, apart from the inducement or persuasion of some law enforcement officer or agent of the government, then it is your duty to find the Defendants William Lentz and R. C. Hullum not guilty.

9. In the opinion for the majority, written by Mr. Justice Rehnquist and joined by Chief Justice Burger and Mr. Justice White, the Court states that in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), it

"ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case . . . where the predisposition of the defendant to commit the crime was established." 425 U.S. at 488–89, 96 S.Ct. at 1649. While concurring in the judgment of the case, Mr. Justice Powell, with Mr. Justice Blackmun, took issue with this holding. *See* 425 U.S. at 492–93, 96 S.Ct. at 1651–52. The concurring opinion points out that the Court had never had occasion to "confront Government overinvolvement in areas outside the realm of contraband offenses." *Id.* at 493, 96 S.Ct. at 1651. Mr. Justice Powell goes on to state, "In these circumstances, I am unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles." *Id.*, 96 S.Ct. at 1651–52.

defendant is shown to have been predisposed to commit the crime.

Even so, while we might very well question the *wisdom* of the prosecutor's decision to bring charges against Lentz,[10] we cannot say with any certainty that it was fundamentally unfair to prosecute Lentz or Hullum. The only case cited by the Supreme Court in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), for the proposition that outrageous conduct might bar prosecution in a proper case, was *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). *Rochin* involved an accused who had had his stomach pumped by the police after his arrest, and this conduct by the police was held to be so shocking as to violate concepts of fundamental fairness under the due process clause. No such shocking occurrences took place in the instant case. After all, the jury could have believed that then Sheriff Hullum conceived the entire plan to wiretap the Maddox residence. Regardless of the undercover devices employed, it could hardly shock anyone's conscience to see an elected law enforcement official prosecuted for willfully and knowingly breaking a law designed to protect citizens from just such conduct.[11] While Lentz came into the plan late, he seems to have embraced it wholeheartedly, provided some of the means by which to carry it out, and taken part with full knowledge of the plan's illegality. The fact that Lentz was merely helping the police in their alleged efforts to catch criminals should not make prosecution of him unfair if he voluntarily and knowingly employed illegal methods. To hold otherwise, would be tantamount to giving police carte blanche to ignore laws passed to protect all citizens against improper invasions of their rights by police conduct.

### "Burglary" Evidence

Lentz complains that evidence showing his willingness to break into the house at Granite Shoals and to obtain serial numbers off the suspected stolen goods should never have been presented to the jury, since it was wholly irrelevant to the crime charged. Alternatively, he contends that if it had some relevance, it still should have been excluded under Fed.R.Evid. 403 as unfairly prejudicial. Lentz' attorney objected every time the prosecution sought to introduce evidence regarding the planned break-in, primarily on grounds that the prosecution continually referred to the operation as a "burglary" when in fact it would not have been a burglary under Texas law. The trial court continued to admit the evidence of Lentz' willingness to participate in the break-in but gave a limiting instruction in its charge that defined burglary under Texas law and told the jury that Lentz and Hullum were not on trial for burglary. Nevertheless, if the evidence was irrelevant or if its prejudicial nature substantially outweighed its probative value, it should have been excluded under the Federal Rules of Evidence. We will assume that Lentz' objections preserved this point on appeal.

█ Since the discussions about the proposed break-in were almost hopelessly intertwined with conversations about the wiretapping, we believe that the break-in evidence was necessary to the government in its attempt to tell the whole story of the

---

10. We here paraphrase Oscar Wilde and observe that if this is the way Burnet County treats its confidential informants, it doesn't deserve to have any. Oscar Wilde is reported to have opined, regarding conditions in Reading Gaol where he was incarcerated, "If this is the way the Queen treats her criminals, she doesn't deserve to have any."

11. Hullum complains that the trial court refused to give his requested jury charge to the effect that it had to acquit him if it found that the actions of the government officers were contrary to common decency and fair play or were so outrageous and offensive as to violate due process. The government, in turn, argues that this is a question of law, not of fact, and was properly excluded from the jury charge. We hold that, as a matter of law, it was not unfair or outrageous to prosecute Hullum for the acts he was charged with committing and that the trial court correctly refused to give such a charge.

crime.[12] The government draws support from *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), which approved of proof of extrinsic offenses under a common scheme or *res gestae* analysis "if the uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other.'" *Id.* at 911–12, n.15 (quoting Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Rev. 325, 331 (1956)). We believe that, since Lentz was brought into the law enforcement group by Hullum both to perform the wiretap and to commit the break-in, evidence of the break-in would be relevant and admissible under *Beechum*.

■ The decision to exclude relevant evidence on grounds of its unfairly prejudicial nature rests in the first instance with the trial court, and we cannot hold, in the circumstances of this case, that the court abused its discretion in admitting this evidence. Even if we were to so hold, we would be inclined to find that the admission of this evidence was harmless error, since the proof of Lentz' involvement in the wiretapping scheme was overwhelming.

### The Indictment

■ Lentz and Hullum argue that the indictment was multiplicitous because in one count Hullum was charged with endeavoring to intercept a wire communication, aided and abetted by Lentz, while in another count Lentz was charged with the substantive offense, aided and abetted by Hullum. The jury convicted on both counts, but the government elected at sentencing to proceed on only one substantive count for each appellant, and each was sentenced to concurrent sentences on the conspiracy and on one substantive count. We believe that the indictment was probably multiplicious, since it charged the same offense in two different counts. *See Gerberding v. United States*, 471 F.2d 55 (8th

Cir. 1973). Nevertheless, a conviction obtained pursuant to a multiplicious indictment does not have to be reversed in all cases, "since an indictment may charge a single crime in a variety of forms to avoid a fatal variance of the evidence." *United States v. Dudley*, 581 F.2d 1193, 1199 (5th Cir. 1978) (citing *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 225, 73 S.Ct. 227, 231, 97 L.Ed. 260 (1952)). If a multiplicitous indictment leads to cumulative sentences, the appropriate remedy is to remand for dismissal of one count. *Dudley*, 581 F.2d at 1199. Since Lentz and Hullum each received only *one* sentence on a substantive count, there is no reason to upset the disposition made by the trial court. *See id.*

■ Lentz and Hullum also contend that they were prejudiced by the government's being allowed to go to trial on the fourth count of the indictment. This count charged them with possession of wiretapping instruments and was dismissed at the close of the government's case. The trial court entered a judgment of acquittal on count four because the telephone lineman's handset used by Lentz was not shown to be an instrument of wiretapping designed for that use. The court then reformed the indictment to reflect the acquittal. We do not think that the defendants have shown that the government knew that count four was frivolous. Nor do we think that allowing the government to present evidence on all four counts was unfairly prejudicial to either defendant.

■ Hullum contends that the indictment varied impermissibly from the proof offered at trial. Specifically, he points out that the indictment charged him with conspiracy and an attempt to tap the "telephone located at the residence of Patricia Maddox, Route 2, Box 72, Mormon Mill Road, Burnet County, Texas," while the evidence at trial showed that Patricia Maddox did not live in the Mormon Mill resi-

---

**12.** Of course, the evidence might be admissible under Fed.R.Evid. 404(b) as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or acci-

dent. However, the government in its brief explicitly rejects this ground of admissibility and instead urges us to accept the "whole story" rationale.

dence at the time of the alleged offense, although she had lived there previously. However, the evidence also showed that Hullum believed that the house was occupied by Maddox. We believe that a variance does exist, although it is a technical one and not necessarily fatal to the prosecution. *See United States v. Baldarrama*, 566 F.2d 560 (5th Cir. 1978), *cert. denied*, 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1979). Hullum is not entitled to a reversal of his conviction unless his substantial rights have been affected. *See United States v. Tilton*, 610 F.2d 302 (5th Cir. 1980). Since Hullum does not allege that any of his substantial rights were affected by this or argue that he was prejudiced in any way by the error in the indictment, we reject this contention as a ground for reversal.

### Jury Charge on Intent

■ Relying on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), Lentz and Hullum urge us to find error in the trial court's instruction on intent and on the inferences permissible from the evidence. The pertinent part of the court's charge is set out in the margin.[13] We think that it is a permissible charge under our case law and does not incorrectly shift the burden of proof to defendants. In fact, the trial court adopted language that we found commendable in *United States v. Chiantese*, 560 F.2d 1244, 1255 (5th Cir. 1977) (en banc). We do not read *Sandstrom* as forbidding this type of charge, since the charge at issue is couched in permissive, not mandatory, language.

### Miscellaneous Assertions of Error

■ Lentz argues that the trial court should have severed his case from Hullum's and that its refusal to do so denied Lentz a fair trial. When defendants are properly joined in the indictment, the denial of a motion for severance is subject to reversal only for abuse of discretion. *United States v. Cuesta*, 597 F.2d 903 (5th Cir. 1979). Defendant Lentz must make a strong showing of prejudice arising from a joint trial in order to gain reversal, *see United States v. Staller*, 616 F.2d 1284 (5th Cir. 1980) and he has not done so here. Lentz argues that his and Hullum's defenses were inconsistent, but in order to prevail Lentz had to show that the "defenses . . . conflict[ed] to the point of being irreconcilable and mutually exclusive." *See United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978). The fact that Lentz had a traditional entrapment defense, while Hullum did not, is not a ground for severance. *See United States v. Eastwood*, 489 F.2d 818, 822 (5th Cir. 1973). Having been shown no compelling prejudice by Lentz, we uphold the action of the trial court.

■ Finally, Hullum charges the prosecution with two instances of misconduct. First, he alleges that the prosecution misled him by indicating in discovery that it was capable of proving the essential elements of count four of the indictment, when that proved not to be the case at trial. We fail to see how Hullum was prejudiced by this action. We would point out that the government was required under the Jencks Act, 18 U.S.C. § 3500, to deliver the discovery materials to Hullum, and *failure* by the government to do so would have been error. Second, Hullum contends that the government obtained his stipulation to the testimony of one witness, who the government asserted would have testified concerning Hullum's bad character. At a post-trial hearing this witness stated that he was unaware of appellant's character in the community and that his testimony would have been based upon an acquaintance with Hullum 12 or 13 years prior to the events charged. Hullum contends that the govern-

---

**13.** It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the Government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent.

ment knew before trial that the witness' testimony would have been inadmissible and that his stipulation was obtained by deceit. Since the government presented four other witnesses who testified that appellant Hullum's reputation for truth and honesty and for being a law-abiding citizen was bad, and three additional witnesses were encompassed within the stipulation to that effect, we fail to see how this one stipulation prejudiced Hullum's rights.[14]

For all of the foregoing reasons, the convictions are

AFFIRMED.

14. Hullum presented six witnesses who testified to his good character.