UNITED STATES of America, Plaintiff-Appellee,

v.

John GARRETT and L.G. Moore, Defendants-Appellants.

No. 82–2147.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1983.

Rehearings and Rehearing En Banc Denied Nov. 22, 1983.

* District Judge of the Northern District of Texas, sitting by designation.

Robert B. Wallis, Clinard Hanby, Houston, Tex., for John Garrett.

Mike Ramsey, Houston, Tex., for L.G. Moore.

Daniel K. Hedges, U.S. Atty., John M. Potter, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before WISDOM, TATE, and GARWOOD, Circuit Judges.

TATE, Circuit Judge:

The defendants John Garrett and L.G. Moore appeal their conviction by a jury under 18 U.S.C. §§ 2, 1952(a)(3) ("The Travel Act")[1], for aiding and abetting one

---

1. The Travel Act 18 U.S.C. § 1952 (1970), provides in pertinent part:

another in using and causing to be used a facility in interstate commerce with the intent to carry on a bribery scheme. The jury found that Garrett and Moore offered and agreed to offer a bribe to a Houston, Texas city councilman for his recommendation and vote in awarding a contract of group insurance for the city's public employees. In facilitation of this unlawful scheme, the jury found, they caused to be used a facility in interstate commerce when Moore placed a long distance telephone call from Houston, Texas to a federal undercover agent in Beverly Hills, California, on December 27, 1979.

On appeal, the defendants challenge the sufficiency of Travel Act jurisdiction premised on an out-of-state phone call made to a federal agent. They claim that jurisdiction was artificially created because the requisite interstate element was supplied by the location of the federal agent, and that the call did not "facilitate" the underlying state offense. Garrett and Moore also contend that they were entrapped by the federal agents into performing unlawful acts, and that the government's conduct was so outrageous as to constitute a violation of due process. Garrett argues that the evidence adduced at trial displayed his absolute lack of predisposition to commit bribery, such that he established entrapment as a matter of law. Moore contends that he was unable to make out the defense because the trial court refused to admit certain evidence of the government's inducements and testimony of witnesses that would tend to show lack of predisposition. Moore additionally argues that the trial court's determination to admit hearsay evidence of a taped conversation concerning his reputation as someone who would "deal" denied him federal constitutional confrontation and fair trial rights.

We find that on the evidence shown, the trial judge did not reversibly err in making these jurisdictional and evidentiary rulings. We therefore affirm the convictions.

### Factual and Procedural Background

These Travel Act convictions are a result of a federal undercover operation that centered upon the suspected illegal activities of labor unions in promoting and contracting for insurance and pension benefits. In 1979, Joseph Hauser pleaded guilty to federal charges of paying bribes and receiving kickbacks in union insurance business; in return for a reduced sentence and financial support of himself and his family, he agreed to cooperate with the government in investigating this type of crime. Hauser and two F.B.I. agents, Mike Wacks and Larry Montague, established a fictitious insurance agency known as Fidelity Financial Consultants, with an office in Beverly Hills, California and a cover by which they would purport to represent the Prudential Insurance Company, a large national concern. Their initial plan was for Hauser to expose corruption among labor leaders by bribing

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means

\* \* \* \* \* \*

(2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

The "unlawful activity" facilitated by the use of interstate commerce in this case was bribery of a state official, proscribed by Tex.Penal Code § 36.02(a)(1), (3) (1975). This statute provides:

(a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:

(1) any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;

\* \* \* \* \* \*

(3) any benefit as consideration for a violation of a duty imposed by law on a public servant or party official.

them to acquire union insurance through Fidelity.

The agents decided to expand operations outside California (at least in part because of publicity that Hauser was a government informer), and, because of Hauser's contacts, began to arrange insurance deals in Texas and Louisiana.[2]

The jury trial took place over 27 days of testimony. The defendants were charged on a conspiracy count and two Travel Act counts; after four days of deliberations, the jury convicted on one Travel Act count, but was unable to agree on a verdict on the conspiracy or other Travel Act count. The government's case was presented during 19 days of testimony, most importantly the testimony of Hauser and the two F.B.I. agents, corroborated by tapes of conversations with the alleged conspirators and tapes of telephone conversations with them. The defendants' case was presented in eight days of testimony.

Aside from establishing that the insurance contract to Prudential at issue had been awarded on its merits in accord with the recommendation of the Texas Municipal League, and numerous character and reputation witnesses for both defendants, the defendants' case relied principally upon their own extensive testimony on the stand by which they presented a lawful explanation for their actions. The substance of the explanation is that they were merely exploiting their political friendships in order to earn a share of a commission for the insurance contract (not in itself unlawful under Texas law), and that the money subsequently given to the city official was a campaign contribution, not a bribe. Garrett also relies upon his initial protestations, in the conversations that unknown to him

were being taped, that he did not wish to participate in any illegal activity.

The government's essentially uncontradicted evidence shows the following:

In August, 1979, Hauser contacted a Texas acquaintance, who put him in contact with Harold Grubbs, a labor official in Houston, on the recommendation that Grubbs would split commissions on insurance deals "fifty-fifty." In a tape-recorded meeting,[3] Grubbs told Hauser about a union official, the defendant L.G. Moore, whom Grubbs described as "someone who would deal" and was "on the take." (On appeal, Moore objects to the use of this tape, GX 7, as highly prejudicial.)

Grubbs introduced Hauser to Moore to discuss the possibility of Moore's obtaining insurance business for Fidelity. Moore discussed his union connections in many states and indicated that insurance coverage for Texas school and hospital districts may be available. Moore, Hauser, and F.B.I. agent Mike Wacks met on September 10, where Moore accepted $2000 from Hauser and the three discussed potential business and potential commissions (a sum of $600,000 was mentioned) that Moore could make. Moore named the defendant Garrett, the President of Richmond Road Engineering and a commissioner of the Port of Houston, as a "deal-maker" who could help them make additional connections for insurance contracts.

Moore introduced Garrett to Hauser and agents Wacks and Montague in October, asking for some "inside wires on the insurance business with Prudential." Garrett called Houston City Councilman Jim Westmoreland at that time to ask him about obtaining for Fidelity and Prudential the city employees' insurance coverage that was going to become open for bidding. This

---

2. The defendants were initially to be indicted with two of the participants in the Louisiana insurance schemes, but these charges were separately brought. The Louisiana dealings were not referred to at the trial, although there was testimony to the effect that Vincent Marinello, a primary actor in the Louisiana dealings, was present during a few of the meetings of the F.B.I. agents and Garrett and Moore.

3. All of the subsequent meetings of the agents with the defendants were tape-recorded; the government also taped telephone conversations of the defendants, in accordance with federal procedures.

insurance contract becomes the focus of subsequent meetings and dealings, although other future and simultaneous deals were discussed and, for the most part, kept from the jury.

Garrett arranged to meet with Councilman Westmoreland after the November City Council election. At a November 28, 1979 meeting of Garrett, Moore, Wacks, and Montague, Garrett turned down an offer of cash but stated that he wanted a fifty percent split of the agents' commissions, which he would then split with Moore. He again called Westmoreland to discuss the Houston employees' insurance contract, telling the others that he "did not mind spending a few dollars if it looks like . . . we have to motivate the works for us."

At the time of these discussions, the Houston City Council was negotiating and soliciting bids in preparation for the January, 1980 expiration of insurance coverage of 25,000 city employees. Without consulting the government agents posing as Prudential/Fidelity agents, Prudential Insurance Company had itself prepared a bid, as did at least four other major companies. The Texas Municipal League ("the League"), a commission representing over two hundred cities in Texas that sought to combine the bargaining power of the cities in order to obtain favorable insurance coverage for the municipalities, independently reviewed the insurance available and, coincidentally, adopted Prudential's plan. The contract finally signed by the City Council on December 26, 1979 was with the League, which contracted with a Texas insurance company that in turn contracted with Prudential to provide the coverage. (It is clear that the League had nothing to do with the efforts to bribe Westmoreland, and that it had independently selected what it considered the best coverage at the lowest price.)

Garrett and Moore's primary efforts in late November and December were to arrange matters so that Prudential would be selected for the new city insurance business that would produce a commission (according to the bogus agents) of around one million dollars. The defendants talked often to government agents Montague and Wacks. (Hauser had disappeared entirely from the scheme because he began serving his prison sentence; Moore knew the fact of Hauser's imprisonment, but explained his absence to Garrett by telling Garrett that Hauser was sick.) Moore telephoned the government agents, who had returned to California, in order to discuss progress of the insurance selection by the Council.

On December 11, Moore, Garrett, Wacks and Montague again met at Garrett's office in Houston to discuss payment of commissions and an upcoming meeting with City Councilman Westmoreland. The agents asked how much to give Westmoreland, and at Garrett's suggestion, they agreed to pay Westmoreland no more than $2000 at the first meeting.

That evening, the four waited at a hotel bar for Westmoreland, accompanied by Vincent Marinello, a lawyer from New Orleans who had independently called Westmoreland and who had worked with Hauser on a similar scheme in Louisiana. (See note 2 supra). Garrett told Montague to forget about paying Westmoreland anything that evening; in response to Montague's question, Garrett replied that, however, Westmoreland understood that he would be paid once the deal was signed. Westmoreland arrived and informed the group that Prudential would get the contract if it were, out of the five companies contending for the contract, the third best bid or better.

Garrett assured Wacks on December 13 that the contract would be approved at the City Council meeting the following week; however, the council postponed its vote on the issue for another week. The City Council voted in favor of the Texas Municipal League/Prudential coverage on December 26; Westmoreland seconded the motion for adoption of the contract and voted for it, while two councilmen voted against it. The next day, December 27, Moore called agent Wacks at the Fidelity offices in Beverly Hills, California. (This is the interstate telephone call upon which the present federal Travel Act indictment is based.) Moore

told Wacks that the contract was to be voted on *that* day (although Moore had been present at the council meeting the day *before,* at which the Council voted in favor of the Prudential contract), and that they needed an extra $10,000 to commit a couple more councilmen. Wacks agreed to pay this sum. In the conversation, Moore stated that Garrett was in the room during the call.

Moore called again the same day, left a message, and Wacks returned the call. Moore then told him that the contract had just been awarded at a premium of $12 million (of which the agreed commission for the agents and the defendants was ten percent).

Moore again called Wacks in California on December 28, asking for $10,000 so that Garrett could pay off Westmoreland. On January 5, 1980, Wacks told Moore that he wanted to be present when the $10,000 was given to Councilman Westmoreland, because the company wanted to ensure that the money was paid. On January 7, Wacks, Montague, Moore and Garrett met at a hotel in Houston where Moore and Garrett were given $6000 as their share of the commissions for the first month.

At this meeting, Garrett told Wacks that he had contacted Westmoreland about the meeting for the payoff, but that Westmoreland was too nervous to accept payment in the agents' presence. They arranged that Garrett would relay a code to Westmoreland's office in the agents' presence to signify that the payoff money was ready for delivery.

On January 11, Garrett, Moore, Wacks, and Montague met in Garrett's office; Wacks gave Garrett $5000 and Garrett left a message with Westmoreland's secretary in code that the "⅝ inch reinforcing steel was in." On January 21, Montague called Moore; Moore said that Garrett called the councilman and said that Westmoreland had "the steel." Garrett, Montague and a third party met on January 22 to discuss future business; Garrett said that Westmoreland was "happy," but wanted to know

when the other payment of $5000 would come.

## The Issues Raised by the Appeals

The following issues are raised by the defendants' appeals:

I. *Travel Act Jurisdiction:* (A) The indictment under the Travel Act, 18 U.S.C. § 1952(a)(3) (quoted in footnote 1) should have been dismissed, or an acquittal ordered, because a violation of this statute, and consequently federal jurisdiction, may not be based on a telephone call with so little interstate nexus with the unlawful activity and which did not "facilitate" the unlawful purpose within the meaning of the Travel Act; (B) Further, the happenstance that the telephone call *to* a government agent finds him located at a site in another state does not furnish a basis for jurisdiction or conviction under the Act.

II. *Entrapment issues:* (A) Availability of the defense; (B) Moore complains of the introduction of a redacted tape from which was excised overwhelming inducements offered to Moore by government witnesses; (C) Moore complains of the exclusion by the trial court of some "lack-of-predisposition" witnesses offered by him; (D) Moore contends that his "lack-of-predisposition" defense was severely prejudiced by the admission into evidence of two tapes of conversations between Hauser and Grubbs (the latter not called to testify), which moreover violated his Sixth Amendment rights since he was unable to cross-examine Grubbs as to his characterization of Moore as a labor leader who would "deal"; (E) Garrett contends that the evidence shows that he was entrapped as a matter of law and that the district court erred in not granting his motion for a directed verdict of acquittal.

III. *Outrageous government conduct:* Both defendants contend that the conduct and degree of involvement of the government agents is so outrageous as to violate their due process rights and entitle them to dismissal of the indictment.

## I. *Travel Act Jurisdiction*

Garrett and Moore contend that federal jurisdiction under the Travel Act may not

be predicated solely upon the out-of-state phone call made by Moore to the government agent in California and, further, that the telephone call to the government agent in the present case did not implicate "intent" to "facilitate" the defendants' "unlawful activities" within the meaning of the Act. The defendants thus argue that the indictment in this case should have been dismissed or acquittal ordered because federal jurisdiction was artificially created by the agents' use of the California office location. They also argue that the use of interstate communications was at best marginally involved in facilitation of an essentially local crime, and that the bribery activity preferably should be attacked under state law and not the Travel Act, which is intended primarily to be a weapon against organized crime.

### (A) Interstate Nexus and "Facilitation" Requirements

The call of December 27, 1979, on which the government based Travel Act jurisdiction for the count on which the defendants were convicted, occurred under the following circumstances, as revealed by the taped conversations introduced into evidence at trial: Garrett requested that Moore call the agents to obtain details concerning the amount of the insurance premium. The same day, from Texas, Moore called agent Wacks at the Fidelity office in Beverly Hills, California, stating that the vote on the insurance contract had been postponed by the City Council and that $10,000 was needed to "move" a couple of the councilmen. Moore told Wacks that Garrett was in the room and needed a commitment from Wacks.

The defendants contend that the interstate call did not "facilitate" an "unlawful activity" within the meaning of the Act. They argue that the primary purpose of the Act was to combat highly organized criminal syndicates whose criminal conduct was beyond the reach of local officials, and that here the underlying state crime of bribery—technically implicating solely an intrastate insurance contract between the Texas Municipal League and the City of Houston—only marginally involved interstate commerce. Furthermore, they assert, the telephone call was merely incidental to commission of the offense, for all of the elements constituting the state crime of bribery were present and the crime was "complete" before the telephone call, when the defendants had agreed to pay Westmoreland for his vote. They also argue that the interstate nature of the calls, caused exclusively by the happenstance of the federal agent's location, contributed nothing to the scheme that could not have been accomplished by an intrastate call.

In urging a narrow construction of the Travel Act that would not encompass this "essentially local" bribery scheme, the defendants emphasize that "[l]egislative history of the Act is limited, but does reveal that [it] was aimed primarily at organized crime and more specifically, at persons who reside in one state while operating or managing illegal activities located in another." *Rewis v. United States,* 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). In *Rewis,* the Supreme Court held that the Travel Act did not reach so far as to include the proprietors of a local gambling operation just because its customers had travelled interstate. The Court expressed concern that "an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which ... geographic origin ..., a matter of happenstance, would transform relatively minor state offenses into federal felonies." 401 U.S. at 812, 91 S.Ct. at 1059.

Subsequently, however, this circuit, later affirmed by the Supreme Court, observed that the Travel Act's expansive language did not outlaw only those "crimes 'typically associated with the underworld.'" *United States v. Perrin,* 580 F.2d 730, 733 (5th Cir.1978), *affirmed,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In *Perrin,* the court found that the bribery of a corporate employee to steal data from his employer constituted an "unlawful activity" for purposes of the Act, and that a single inter-

state telephone call sufficiently facilitated the plan so as to sustain federal jurisdiction.

In affirming the determination of this court the Supreme Court held that the statute encompassed illegal activities besides those traditionally associated with organized crime, explaining that its concern in *Rewis* was not with the local nature of the predicate intrastate gambling operation, but with the "tenuous interstate commerce element." *Perrin,* 444 U.S. at 50, 100 S.Ct. at 318.

■ The Court concluded that, with regard to an underlying unlawful state "bribery" activity, 18 U.S.C. § 1952(b)(2), "so long as the requisite interstate nexus is present, the statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement." 444 U.S. at 812, 91 S.Ct. at 1059. Thus, here, bribery of a city official—the unlawful activity underlying use of interstate communication facilities in violation of the Travel Act—is clearly within the ambit of the statute. *See also United States v. Pecora,* 693 F.2d 421 (5th Cir.1982) (bribery of a state sheriff).

We thus must analyze the nature of "the interstate nexus", *Perrin,* 444 U.S. at 812, 91 S.Ct. at 1059, *i.e.,* the interstate telephone call that defendant Moore placed from Texas to federal agent Wacks in California, in order to consider the defendants' contention that the call does not sustain federal jurisdiction or prove a violation of the federal act, because it did not facilitate, or at most only incidentally facilitated, unlawful activity, and because it occurred subsequent to the completed state offense of bribery (even though the bribe money was actually paid after the telephone call).

■ The Travel Act punishes the use of interstate facilities to "facilitate" the carrying on of unlawful activities that are *"thereafter"* performed, 18 U.S.C. § 1952(a) (quoted at note 1 *supra* ), pertinently including the unlawful activity of "bribery", 18 U.S.C. § 1952(b)(2). The Act "reaches anyone who travels interstate or uses an interstate facility to facilitate an unlawful activity and thereafter performs or attempts to perform an act in aid thereof." *United States v. Jones,* 642 F.2d 909, 913 (5th Cir.1981).

In both *Perrin* and *Pecora, supra,* the courts upheld a Travel Act violation based on a single interstate telephone call. *Perrin* involved a conspiracy to bribe an employee of a geological corporation (who acted as a government informer), in which the coconspirators bribed the employed informer to steal seismic exploration charts from his employer and to help set up a corporation for exploiting the data. The informer was instructed by the subsequently convicted coconspirators to call an out-of-state geological service to order corresponding maps for the stolen data. We stated that we need not consider the defendants' argument that obtaining the maps did not constitute an essential aspect of the already completed bribery agreement, for "[t]here is no requirement that the use of interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities makes easier or facilitates the unlawful activity." 580 F.2d at 736. *Accord, United States v. Jones,* 642 F.2d 909, 913 (5th Cir.1981).

In *Pecora,* Travel Act jurisdiction was founded upon an interstate telephone call from the defendant, made at the request of the sheriff (who was cooperating with the F.B.I.), to discuss details of the proposed bribery to secure the dismissal of state drug charges. We applied *Perrin* and rejected the defendants' contention that the call, even if it made the bribery scheme easier, was too "fortuitous and incidental" to invoke the Travel Act. We concluded that the call served to "benefit" the scheme and that "we discern in the Travel Act no exception for casual and incidental occurrences or for 'happenstance' ones." 693 F.2d at 424.

■ Aside from the aspect of the government agent's location outside the state when the interstate call was received by him (which will be discussed below), the telephone call in the present case requesting funds for bribery is no more incidental or

fortuitous than the calls invoking the Travel Act in *Perrin* and *Pecora,* found to be sufficient to sustain jurisdiction. The defendants argue that the interstate nature of the call, a mere happenstance resulting from the location of the government agent, added no special assistance to the scheme, for the same objects could have been accomplished by an intrastate call. This argument was implicitly rejected in *Perrin* and *Pecora,* for in those cases the defendants' plans would have been served equally by an intrastate call.

The defendants argue that the call did not benefit whatsoever the unlawful activity, because under Texas law, the crime of bribery was complete when the defendants agreed to pay Westmoreland for his vote. Arranging actual payment of the bribe, however, undoubtedly made easier the commission of the scheme, just as in *Perrin,* where the defendants had already offered to bribe the employee, an offense under Louisiana law, but used the interstate call to effect exploitation of the stolen data in order to pay the agreed-upon bribe—a percentage of the profits from the scheme.

We also cannot accept the defendants' contention that the call to a government agent could not "facilitate" the crime. At least by implication, *Perrin* and *Pecora* require rejection of this argument. There, the defendants were held properly convicted under the Travel Act for attempting to bribe the sheriff and the corporation employee, both of whom were secretly cooperating with federal authorities.

In the present case, Moore's call to Wacks to obtain funds (which resulted in Wacks subsequently giving the defendants $10,000) actually benefited the defendants' plans to arrange payment for Westmoreland in accordance with their agreement to pay him for his vote; it thus facilitated the unlawful bribery activity within the meaning of the Act, following and as a consequence of which the bribe money was actually paid. Moore's call to Wacks in this case likewise serves to invoke Travel Act jurisdiction over his codefendant Garrett, who aided and abetted in the entire scheme, was aware that the agents were based in California, and was present during Moore's call. The evidence further shows that he directed Moore to call the agents for the $10,000; as in *Perrin,* where the defendants instructed a participant to telephone out-of-state, "it is sufficient that the [defendant] *caused* the use of interstate facilities." 580 F.2d at 736 (emphasis added).

(B) *Artificial Creation of Travel Act Jurisdiction?*

The defendants strenuously contend that federal jurisdiction was contrived, because the interstate element depended on the federal agents' location in California to receive the interstate call from Moore. Garrett and Moore argue that the existence of a federal crime should not depend upon the government's arbitrary—and in their opinion, inconvenient—out-of-state locale for the fictitious insurance agency, and that it was not necessary or useful to the government's "sting" operation or to the bribery scheme that the agents be outside the state on the dates of the city council vote regarding the insurance plan. The defendants suggest that it was at best a matter of happenstance, "and perhaps, a matter of government design", that the agents were in California during this time. They urge that this court adopt the standard articulated by the Second Circuit on rehearing in *United States v. Archer,* 486 F.2d 670, 685–86 (2d Cir.1973) (emphasis added): "when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a *stricter standard* is applicable than when the interstate or foreign activities are those of the defendants themselves."[4]

---

4. Because of the nature of governmental involvement, the Second Circuit in *Archer* rejected the establishment of Travel Act jurisdiction on the basis of several interstate and foreign phone calls. The court discarded as artificially created one call, where the government agent travelled into New Jersey solely in order to make a call to the defendants in New York (which the defendants then returned). 486 F.2d at 681. It also rejected the defendants' calls to Las Vegas that were in response to a government plant of misinformation that the

In both *Perrin* and *Pecora,* discussed above, the defendants raised similar arguments concerning whether governmental agents improperly supplied the interstate nexus in the Travel Act prosecution. In *Perrin,* the court set forth the *Archer* standard urged by the defendants, and noted that jurisdiction in *Perrin* had been established by one count of the indictment that specified an out-of-state call to a third party made by one of the coconspirators. The court also considered, however, the Travel Act count in which jurisdiction depended upon the interstate phone call to a map store made by the government informer, determining that it could not "condemn the fact that the government informer was involved in the interstate element of the crime." 580 F.2d at 736. It found that the informer was a "follower" in the scheme and that another coconspirator selected the out-of-state source of the maps. This court warned, however, that although there was no artificial manufacture of jurisdiction present, a government informer could not "at the behest of the government ... unilaterally supply the interstate element of a local bribery scheme and thereby transform [it] into a Travel Act violation: for example, [he] could not at the government's direction [go out of state] merely to call one of the coconspirators." *Id.*

In *Pecora,* the sheriff, acting for the government, had a message relayed to the defendant, while she was out-of-state, to call him to arrange the details of the planned bribery. The court found that there was no attempt to create or manufacture federal jurisdiction artificially under the Travel Act, for ample evidence existed to support the trial court's determination that the sheriff requested the defendant to call before he learned that she was out-of-state. The court concluded that "[u]nlike *Archer,* the interstate element in this case

was not furnished *solely* by undercover agents and there is no question of any attempt to contrive jurisdiction." 693 F.2d at 424 (emphasis added).[5]

*Pecora* and *Perrin* thus do not expressly adopt or reject the *Archer* "stricter standard" for testing the sufficiency of an interstate nexus involving government agents. In instances when the interstate nexus is furnished by a telephone call to a government agent, these decisions do, however, require the court to scrutinize the government's apparent reasons for its actions and forbid the government agent's movement out-of-state for the sole purpose of manufacturing Travel Act jurisdiction.

■ In the present case, no evidence shows that the agents initially set up Fidelity in California or arranged to be there when Moore and Garrett needed to telephone them for additional funds solely for the purpose of contriving an interstate nexus. The agents had established a base in California because of Hauser's connections there and, subsequently, decided to branch out-of-state from California into Louisiana and Texas because their activities in California were impaired by publicity that Hauser was a government informer. This preexisting out-of-state operation, combined with the fact that the defendant Moore was aware of the interstate nature of the agents' (fictitious) insurance business when he himself telephoned the agents in California, is sufficient to show that the interstate element was not *solely* furnished by government agents and that the government did not attempt to contrive jurisdiction. *See also United States v. Bagnariol,* 665 F.2d 877, 896–99 (9th Cir.1981) (the government agent's residence in a state other than that of the defendant was not established solely to manufacture an inter-

---

agent could be reached there. *Id.* at 682. Finally, the court rejected as a "casual and incidental occurrence" the call that the government agent placed to the defendants while he was pursuing another government investigation in Paris. *Id.* at 682–83.

5. The *Pecora* court then rejected the *Archer* rationale for not permitting jurisdiction to be based on the government agent's call from Paris (*see* note 4 *supra*); contrary to the Second Circuit, this court concluded that the Travel Act did not except "casual, incidental, or happenstance" interstate contacts.

state element, but was a result of a prior undercover operation).

Because we find that interstate nexus here similarly was not artificially created to invoke federal jurisdiction, and does not infringe the standards of *Perrin* and *Pecora,* we conclude that Travel Act jurisdiction exists.

## II. *Entrapment Issues*

In trial, and now on appeal, the defendants urged that they were innocent by reason of government entrapment. In our en banc opinion in *United States v. Webster,* 649 F.2d 346, 348–49 (5th Cir.1981), we summarized the principles relating to the defense of entrapment:

> First recognized by the Supreme Court in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the defense of entrapment is "virtually unique to the criminal jurisprudence of the United States," G. Fletcher, *Rethinking Criminal Law,* § 7.3.B, at 541 (1978); *See* Mikell, *The Federal Courts,* 90 U.Pa. L.Rev. 245, 246 (1942). The justification for the defense is "that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government." *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). Three major Supreme Court cases, decided over a span of 41 years, establish that entrapment occurs "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. U.S.* 287 U.S. at 442, 53 S.Ct. at 212–213; *accord, United States v. Russell,* 411 U.S. at 428–29, 93 S.Ct. at 1641; *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958).

> Notwithstanding the forceful arguments to the contrary, it is clear that when entrapment is at issue the focal point of the inquiry is on the predisposition of the defendant. *See United States v. Russell,* 411 U.S. at 433, 93 S.Ct. at 1643. Thus, a defendant who wishes to assert an entrapment defense must initially come forward with evidence " 'that the Government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it.' " *United States v. Dickens,* 524 F.2d 441, 444 (5th Cir.1975) (quoting *United States v. Mosley,* 496 F.2d 1012, 1014 (5th Cir.1974)). Once the defendant has carried this burden, the government must, if it is to prevail, prove beyond a reasonable doubt that the defendant was predisposed to commit the crime charged. *United States v. Dickens,* 524 F.2d at 444.

During the government's case, the trial court ruled that there was sufficient evidence in the record to raise the entrapment defense. The trial court found that the evidence of government monetary inducements and the initiation of contacts for the insurance scheme satisfied the defendants' initial burden under *United States v. Dickens,* 524 F.2d 441, 443 (5th Cir.1975), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976), to come forward with evidence showing that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it. Therefore, once the defendant raised the issue that the government had induced the defendants beyond merely affording opportunity or the facilities to commit a crime, the government was required to prove beyond a reasonable doubt "that the defendant was predisposed to commit the charged offense." *Dickens,* 524 F.2d at 444.

The trial judge permitted the defendants to present evidence and argue lack of predisposition, and instructed the jury that, if it found lack of predisposition on the part of Garrett or Moore, it must acquit such defendant of the charged offense.[6] By con-

---

6. The jury charge (to which the parties do not now object on appeal) reads in part:

victing the defendants, the jury rejected the entrapment defense.

On appeal, the issues raised relating to entrapment are:

*A.* As a threshold issue, the government contends that, even if error was committed in the respects contended by the defendants, it was harmless. The government argues that the entrapment defense was not available to the defendants under the facts presented, and therefore the district court improperly submitted the defense to the jury.

*B.* Moore complains of the introduction of a redacted tape from which was excised overwhelming inducements offered Moore by government witnesses.

*C.* Moore complains of the exclusion by the trial court of some "lack-of-predisposition" witnesses offered by him.

*D.* Moore contends that his "lack-of-predisposition" defense was severely prejudiced by the admission into evidence of two tapes of conversations between Hauser and Grubbs (the latter not called to testify), which moreover violated his Sixth Amendment rights since he was unable to cross-examine Grubbs as to his characterization of Moore as a labor leader who would "deal".

*E.* Garrett contends that the evidence shows that he was entrapped as a matter of law and that the district court erred in not granting his motion for a directed verdict of acquittal.

---

The defendants assert that they were the victims of entrapment as to the offenses charged in the indictment. Entrapment occurs when the criminal design originates with officials of the government and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute. Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officials or their agents to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break

## A. *Availability of the Defense*

The government contends that none of the defendants' contentions of error should be considered because Garrett and Moore were incorrectly permitted by the district court to raise before the jury the defense of entrapment. The government contends that a criminal defendant cannot, as a matter of law, assert entrapment unless he admits committing the charged offense. Garrett and Moore reply that their defense that they lacked the intent to bribe Councilman Westmoreland is not inconsistent with the defense that, if their activity in approaching Westmoreland for help with the Prudential contract and subsequently making a campaign contribution is indeed criminally culpable, they were nonetheless entrapped into doing so by the government agents' inducements.

■ In this circuit, the general rule is that the defendant may not deny the commission of the acts on which criminal liability is predicated and simultaneously claim that he was entrapped to perform those acts. "The rationale for the rule appears to be that to deny the very acts upon which the prosecution is predicated and at the same time to plead the defense of entrapment, which assumes that the acts charged were committed, is too inconsistent." *United States v. Greenfield,* 554 F.2d 179, 182 (5th Cir.1977). The early decisions on this issue recognized that for practical reasons a defendant could not generally deny the substantive charge and raise entrapment, because in most cases, a defendant proving

---

the law, the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment. For example, it is not entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction. Law enforcement officials are not precluded from utilizing artifice, stealth and stratagem, such as the use of decoys and undercover agents, in order to apprehend persons engaged in criminal activities, provided that they merely afford opportunities or facilities for the commission of the offenses, by one predisposed or ready to commit it.

that he did not commit the criminal act could not consistently also prove that the government induced him to commit the act that he denies occurred. *Sears v. United States,* 343 F.2d 139, 143 (5th Cir.1965); *Henderson v. United States,* 237 F.2d 169, 173 (5th Cir.1956). *See also Hamilton v. United States,* 221 F.2d 611, 614 (5th Cir. 1955) (defendant permitted to deny charge and assert entrapment; the court noted, however, that the defense of entrapment "assumes that the act charged was committed").

In both *Sears* and *Henderson,* however, this court recognized exceptions to the general situation and permitted dual defenses where, under the particular facts, "proof of entrapment [is not] contrary or repugnant to proof that the defendant is otherwise not guilty." *Henderson, supra,* 237 F.2d at 173. In *Henderson,* the defendant was permitted to admit to operating an illicit still, deny knowledge of (and thus participation in) a larger conspiracy, and "still defend on the ground that such overt acts as he did commit were done as a result of entrapment." *Id.*[7] In *Sears,* the defendant, a sheriff, was charged with participation in a conspiracy to manufacture and sell illegal liquor by accepting a bribe; he was able to deny acceptance of the bribe and all knowledge of the conspiracy but receive a jury instruction on entrapment because the government's own case in chief injected substantial evidence of entrapment in the case. *Sears, supra,* 343 F.2d at 143.

Although in *Henderson* we stated that "it is generally held that inconsistent defenses may be interposed in a criminal case"—and thus declined to determine "[w]hether a greater degree of inconsistency in defenses

[than presented in that case] should be permitted," *id.,* 237 F.2d at 173—subsequent decisions have recognized the requirement of consistency of defenses; *see,* "where a defendant does not have to take an inconsistent position, he is not precluded from invoking entrapment as a defense," *United States v. Harrell,* 436 F.2d 606, 612 (5th Cir.1970). Nevertheless, this court has determined that generally "the defense of entrapment is unavailable unless the defendant admits the facts upon which the prosecution is based." *United States v. Crossman,* 663 F.2d 607, 610 (5th Cir.1981). *See also United States v. Webster,* 649 F.2d 346, 351 n. 10 (5th Cir.1981) (en banc) (dicta); *McCarty v. United States,* 379 F.2d 285, 286–87 (5th Cir.), *cert. denied,* 389 U.S. 929, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967); *Beatty v. United States,* 377 F.2d 181, 186 (5th Cir.), *reversed on other grounds,* 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967). One basis for this approach seems to be that inconsistent defenses will tend to "confuse" the jury, *see Sears, supra,* 343 F.2d at 143, due to the "inherent inconsistency" in saying at the same time that "I didn't do it," and "the government tricked or seduced me into doing it." *United States v. Brooks,* 611 F.2d 614, 618 (5th Cir.1980).[8]

The rule that the defendant must admit to the facts or acts constituting the charged offense is now firmly entrenched in this circuit. The most recent decisions of this court present some confusion, however, as to whether the defendant, while admitting to his involvement in the acts underlying the offense, may assert entrapment and argue that he does not possess the requisite *knowledge* or *intent* to render his conduct culpable. *See United States v. Hill,* 626

---

**7.** The court explained that it was proper for the defendant to argue: " 'I did not go so far as to become a party to the conspiracy, but to the extent that I did travel down the road to crime, I was entrapped[,' for] the defenses do not seem to us so repugnant that proof of the one necessarily disproves the other." *Henderson, supra,* 237 F.2d at 173.

**8.** However, the now "fundamental rule that a defendant may not alternatively rely on inconsistent defenses of entrapment and denial of the commission of the crime has come under

increasing attack," *United States v. Hill,* 626 F.2d 1301, 1303 n. 2 (5th Cir.1980). *See also United States v. Daniels,* 572 F.2d 535, 542 (5th Cir.1978) (criticizing the Fifth Circuit's position). The Ninth Circuit has rejected the inconsistency defense theory as "seriously infirm," since, as the *Henderson* court pointed out, criminal defendants are permitted to raise inconsistent defenses in other contexts. *See United States v. Demma,* 523 F.2d 981, 982 (9th Cir.1975) (en banc).

F.2d 1301, 1303 n. 2 (5th Cir.1980) (noting the "disarray" of decisions in this circuit, but not addressing the "controversy" given the facts of that case). We find that the better approach, more in accord with the case law, is to determine whether the defendant's asserted defense is necessarily inconsistent with an allegation of entrapment.

In *United States v. Greenfield, supra,* 554 F.2d at 182, we discussed the *Sears* and *Henderson* decisions, concluding that the defendant, a doctor charged with illegally prescribing controlled drugs, should be permitted to deny commission of any crime and also raise the defense of entrapment. We found that the doctor's claim of legitimate medical purpose and lack of culpable knowledge or criminal intent—while admitting to the acts of prescribing the drugs—was not so "impermissibly inconsistent" as to preclude his argument that "to the extent that the jury may find culpability on his part, he was entrapped." 554 F.2d at 183. *See also United States v. Smith,* 407 F.2d 202, 204 (5th Cir.1969), *cert. denied,* 397 U.S. 949, 90 S.Ct. 972, 25 L.Ed.2d 131 (1970) (defenses of lack of guilt and entrapment permitted as not inconsistent where the defendant contended that he was an agent rather than principal, but that whatever role he played was a result of entrapment).

■ In the present case, similar to *Greenfield,* Garrett and Moore deny wrongful intent to bribe Westmoreland; they instead argue that the payment, an undisputed act, was an innocent campaign contribution made *after* the city council voted to accept the Prudential Insurance plan as propounded by the Texas Municipal League. We agree with the trial judge that these alternative defenses, both founded on identical facts, are not impermissibly inconsistent.

Two cases after *Greenfield* do not compel us to adopt a contrary analysis. In *United States v. Brooks,* 611 F.2d 614, 618 (5th Cir.1980), citing *Greenfield,* we stated that in light of the defendant's defense of entrapment to sell firearms illegally, it is doubtful whether the court should consider his alternative defense that "he had no intention to violate the law because he did what was customary and what was, in his opinion, permissible." 611 F.2d at 618. Regardless of the court's doubt as to the efficacy of these alternative defenses, it emphasized that the contention of lack of culpable knowledge or intent was not raised until closing argument and that the evidence as to the element of culpable intent was overwhelming. 611 F.2d at 617, 619. A panel of the Former Fifth Circuit, Unit B, cites solely to *Brooks* in rejecting the defendant's defense of entrapment to the charge of possession with intent to distribute cocaine, where the defendant contended during trial that he had no intent to distribute. *United States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.1982). It is arguable that the precedential value of *Nicoll* is minimal with respect to denying alternative defenses, however, because the court also notes that the defendant failed to assert the entrapment defense at trial, and thus cannot raise it for the first time on appeal.

We conclude that the defendants' defense of non-guilt—that they intended to offer money to the city councilman as a political contribution and not as a bribe to obtain favors—is not inconsistent with the defense that, whatever the legal characterization of the payment, they were entrapped into making it by the government agents. We therefore turn now to the defendants' contentions concerning the trial court's rulings with respect to the entrapment defense.

*B. Introduction of Redacted Tapes*

■ Moore contends that the trial court erred in refusing to permit him to play before the jury a portion of a government tape-recording of a meeting between him and government informant Hauser and F.B.I. agent Wacks in which the government agents offered to pay Moore $600,000 in commissions, to use their influence to place Moore's son in Georgetown Law School and to help Moore become president of International Union of Operating Engineers, in return for Moore's use of union, political and business influence to obtain

insurance contracts for Prudential. Moore was able to cross-examine the agents regarding all of these inducements, but he argues that it was necessary for the jury to hear directly the taped version for their consideration of his lack of predisposition. Moore suggests that the trial court's ruling was erroneously founded on a conclusion that evidence of these inordinate inducements was not admissible with respect to the jury issue of predisposition.

We disagree. The trial court stated that it disallowed the playing of the redacted portion because it also contained references to a proposed insurance deal in Austin that implicated other individuals and that was not the subject of the charged offense. Because Moore had the opportunity to elicit all of the desired information on cross-examination, he was not prejudiced by the trial court's determination to exclude the tape itself.

■ Moore also urges that because the government was permitted to play another part of the same tape, Fed.R.Evid. 106 requires that when one party introduces part of a writing or recording, an adverse party may require introduction of any other part of the recording that "ought in fairness to be considered contemporaneously with it." This "completeness doctrine," however, does not require introduction of portions of a statement that are neither relevant to nor explanatory of the admitted passages. *United States v. Marin,* 669 F.2d 73, 84–85 (2d Cir.1982). Here, the redacted portion contained irrelevant matters (excluded at least in part due to possible prejudice to Moore by including wrongdoings that were not the subject of the trial), and Moore elicited the relevant information through cross-examination, such that "fairness" did not require playing of the entire tape.

### C. Exclusion of "Predisposition" Witnesses

■ At the conclusion of the defendant Moore's testimony at the close of this long trial, the district court denied Moore's counsel additional witnesses tendered on the issue of "predisposition." Moore contends that these rulings prejudicially hampered his defense on that issue.

The first contention is with regard to ten listed witnesses, public officials, who were to be called to give testimony that they had had dealings with Moore over a period of years in the political and labor fields and that they had never known him to do any improper, illegal or immoral act, or to attempt to commit any offense in the nature of bribery. By this time, during presentation of the defense case, at least eight witnesses had already testified that Moore, to their knowledge, had never taken a bribe and had an unblemished reputation. In denying the proffered testimony, the district judge, inter alia, characterized these tendered witnesses as "additional character witnesses" and ruled that he had already "allowed ample character witnesses for a case of this kind." We are unable to find an abuse of the district court's discretion under Fed.R.Evid. 404 to allow additional, cumulative testimony of this nature. *Accord, United States v. Haynes,* 554 F.2d 231, 234 (5th Cir.1977).

■ Additionally, Moore also objects to the trial court's rejection of a proffer of the testimony of a lawyer, Ray, who was prepared to testify that Moore consulted him about the legality of accepting insurance commissions for his efforts regarding the City of Houston contract. Moore argues that this evidence would have shown his desire to abide by the law and thus would have proven lack of predisposition to commit the charged offense. Moore had already testified at trial, however, that he had consulted with an attorney who had told him that it was legal for him to receive the commission, so that the substance of Ray's proposed testimony was before the jury. Moreover, the attorney's opinion concerned the propriety of receipt of the commissions *by* Moore, a person not licensed to sell insurance; while the subject at issue at the trial was the legality of the payments *to* Westmoreland, as to which the attorney's opinion was marginally, if at all, relevant. We conclude that the district court did not

abuse its discretion by excluding Ray's testimony.

D. *Introduction of the Grubbs Tapes*

■ Moore contends that the introduction into evidence of two taped conversations between Harold Grubbs and government witness Joseph Hauser, is reversible error because the government tapes contain prejudicial hearsay concerning Moore's reputation. These tapes contain Grubbs' assertions that Moore, as a union official, would be a likely candidate to help Hauser obtain insurance business. At many points in the tapes, Grubbs describes Moore as someone who will "deal".

At trial, Moore argued that introduction of these statements about his character was prohibited by *United States v. Webster,* 649 F.2d 346 (5th Cir.1981) (en banc), in which this court held that hearsay evidence of reputation is generally inadmissible for the government to show the defendant's predisposition and thus rebut an entrapment defense. Moore also urges that his Sixth Amendment confrontation rights were violated because Grubbs was unavailable for cross-examination with respect to the allegedly hearsay statements.

Before introduction of the tapes containing the objectionable statements, the trial court gave a cautionary instruction to the jury that Grubbs was unavailable to testify and that his statements were not admissible to show Moore's bad character, but only to show why Hauser approached Moore. The court reiterated this warning during the final jury charge. The government argues, inter alia, that the tapes—constituting a half day of the jury's proceedings—were properly admitted for the limited purpose to show why the government agents acted as they did in meeting with Moore.

Grubbs' statements about the defendant Moore in the Grubbs-Hauser tapes were clearly inadmissible hearsay, both as to his predisposition, see *Webster, supra,* and as declarations by a coconspirator (since Moore had not even been approached yet to join the alleged conspiracy). We doubt that the statements were admissible over Moore's

objection for the proffered purpose of showing why the government's witnesses approached Moore, because the relevant purpose for their admission—that the government agents had approached Moore on Grubbs' recommendation—could have proved by testimony to this effect without embellishment by the lengthy and many references to Moore in the prejudicial and uncross-examined statements of Grubbs that Moore was one who would "deal". Fed.R.Evid. 403.

We need not expressly rule on this issue, however, because if there was error, it was harmless. In the first place, the trial court expressly and repeatedly cautioned the jury against giving credence to Grubbs' statements. Additionally, over the government's hearsay objection, the district court permitted Moore to testify at length as to Grubbs' representations to him about the Prudential transaction and about Grubbs' dealings with Hauser, R. 41, p. 187 *et seq.,* which clearly developed Moore's defense that he thought he was doing nothing illegal when, induced by the government agents, he went to work to earn commissions for himself from Prudential and political contributions for labor and its friends.

Weighing even more heavily in favor of the harmlessness of the error, Moore's "intent and predisposition to commit the acts charged was established largely by recorded evidence of his own statements." *United States v. Howell,* 664 F.2d 101, 105 (5th Cir.1981) (holding under virtually identical circumstances and contentions that the error was harmless). The Grubbs-Hauser tapes were played on the ninth day of evidence taken during the twenty-seven days of trial. Evidence adduced after these tapes, primarily in the form of Moore's conversations with Garrett and the government agents, showed that Moore readily and immediately joined the insurance scheme and was active at every stage of the events. Considering the entire record, we are unable to find that the Grubbs' references to Moore in the tapes, which the jury was repeatedly cautioned by the district court not to credit for their truth, caused

prejudice to any appreciable degree to Moore's entrapment defense.

### E. Entrapment as a Matter of Law

■ Garrett contends that, regardless of the jury determination of guilt, he was entrapped as a matter of law. He argues that the government failed to offer proof that Garrett was predisposed to engage in a bribery-type offense and that his acts were a product of this predisposition rather than the activity of the government agents. In particular, Garrett argues that he initially refused to accept any payment from the agents, that he told the government agents that he did not wish to do anything illegal or fraudulent, and that the government agents suggested that he make the contribution to Westmoreland. At trial, Garrett testified that he sought to use his political influence only, and that he told Westmoreland that the pay-off was a political contribution made after the City Council vote on the insurance contract.

"It is well-settled that the question of entrapment, if fairly raised, is one for the jury." *United States v. Lentz,* 624 F.2d 1280, 1286 (5th Cir.1980). *See generally United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). In the present case, as we have stated, the defendants met their initial burden of production to present evidence that the government agents induced them to commit the charged offense. Having put forward the issue of entrapment, Garrett argues there was no evidence of predisposition and thus entrapment existed as a matter of law.

We disagree. Although it is unclear from the first of the taped meetings whether Garrett was offered any cash by Hauser, Wacks or Montague, he discussed a 10% commission split with Moore, and originated the idea of calling Councilman Westmoreland. Subsequently, he stated that he was not opposed to "spending a few dollars . . . to motivate the works for us" and discussed "deliveries" of funds to Westmoreland. These activities, along with Moore and Garrett's discussion of prior "cuts on deals," constituted evidence from which a jury

could determine the existence of predisposition to engage in the transactions that resulted in the Travel Act offense. As stated in *United States v. Dickens, supra,* 524 F.2d at 445:

> a jury may appropriately consider the defendant's conduct and statements subsequent to his initial contact with the government agent, as well as proof of his state of mind before the contact was made, to determine whether the accused should be classified as an "unwary innocent" or an "unwary criminal."

Because the government raised sufficient evidence to place the issue of predisposition before the jury, and there is no objection to the jury instruction, we do not "usurp the jury's proper role" to determine whether entrapment was present. *United States v. Anderton,* 679 F.2d 1199, 1202 (5th Cir. 1982). The evidence Garrett presented characterizing his activities as motivated by innocent intent is not "so overwhelming that it is 'patently clear' or 'obvious' that [he] was entrapped as a matter of law." *Lentz, supra,* 624 F.2d at 1287. As in *Lentz,* the jury could find with respect to the evidence that Garrett was a willing, knowing and voluntary participant in an illegal scheme, even though that scheme was conceived and in part implemented by law enforcement agents. *Id.*

### III. Outrageous Government Conduct

■ Garrett, joined by Moore, argues that the conduct and degree of involvement of the government agents in this case is so outrageous as to violate due process guarantees of the Fifth Amendment. He asserts, as in the entrapment defense, that the crime allegedly committed would not have occurred but for the actions of the government agents. Additionally, Garrett urges that the government's actions created outrageous risks of harm: that the City of Houston purchased an insurance policy for its employees based at least in part on the efforts of the defendants and the government agents (risking their obtaining inferior coverage) and that Garrett's life was endangered because the government's ac-

tivities entangled him with a Carlos Marcello, alleged to be an underworld leader, who allegedly had an interest in the Hauser insurance scheme.

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), five justices of the Supreme Court[9] indicated that in some circumstances government involvement in the charged crime could be so excessive and outrageous as to bar prosecution of the private citizen. In *United States v. Tobias,* 662 F.2d 381, 386–87 (5th Cir.1981), this circuit recognized the defense, indicating, however, that a due process violation will be found in only "the rarest and most outrageous circumstances." *Id.* at 387. Subsequently, in *United States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.1982), this court recognized, but rejected, the defense where the defendant sought to purchase cocaine from the government.

In *Tobias, supra,* the court held that there was no outrageous government conduct where the Drug Enforcement Administrator (DEA) established a chemical supply company to detect the manufacture of illicit drugs, and urged the defendant to manufacture amphetamines after he had cancelled his order for supplies to produce cocaine. The court determined that the case presented the "outer limits" to which the government could go in its attempts to ferret out and prosecute crimes, but found that under the totality of the circumstances, the defendant was a predisposed, active participant in a scheme to manufacture an illegal drug and was motivated exclusively by the desire to make money. 662 F.2d at 387. In *Nicoll,* the government's conduct was found not to be egregious where the DEA merely initiated contact with the defendant, who then actively negotiated the cocaine deal. 664 F.2d at 1314.

Under *Tobias* and *Nicoll* and the prevalent jurisprudence, we cannot find that the government's conduct was so egregious and outrageous as to make the defendants' convictions subject to attack as a denial of due process.[10]

*Conclusion*

Because there was federal Travel Act jurisdiction in the present case, and the jury could properly determine that Garrett and Moore were not entrapped by virtue of government misconduct, we AFFIRM their convictions below.

AFFIRMED.

GARWOOD, Circuit Judge, Specially Concurring:

I concur in all of Judge Tate's excellent opinion for the Court except Part II.A. thereof ("Availability of the Defense"). I do not reach the difficult issues concerning the availability of the defense of entrapment dealt with in Part II.A. of the opinion because resolution of those issues is not

---

**9.** *See* 425 U.S. at 491, 494, 96 S.Ct. at 1650, 1652 (Powell, J., joined by Blackmun, J., concurring); 425 U.S. at 495, 96 S.Ct. at 1652 (Brennan, J., joined by Stewart and Marshall, JJ., dissenting). At least three other circuit courts have adopted this view. *See United States v. Leja,* 563 F.2d 244 (6th Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978); *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971).

**10.** Although this conclusion seems required by precedent of this circuit, the author of this opinion, expressing views personal to him alone of the panel, insofar as he knows, feels obliged to note that, were he writing on a clean slate, he would feel that the defendants' due process rights were violated by their conviction of government-created crimes spawned from an enterprise of this magnitude formed solely for the purpose of inducing individuals to commit crimes through inordinately large financial inducements, whatever the predispositions of the individuals so ensnared.

Further, in the author's personal view, the federalizing of the state bribery offense—itself spawned and created by governmental inducements of this nature and magnitude—is an unjustifiable expansion of the Congressionally-intended reach of the Travel Act, especially where federal jurisdiction is founded upon a single interstate telephone call to a government agent (where the government had itself initiated the initial interstate contact with the Texas defendant). Again, however, I feel compelled by the precedents of this circuit to find Travel Act jurisdiction in the present case.

necessary to and does not affect the disposition of this appeal.*

---

* Nor do I have occasion to take any position respecting the matters commented on in note 10.